George GRIVAS et al., Libelants-
Appellants,

v.

ALIANZA COMPANIA ARMADORA,
S.A., et al., Respondents-Appellees.

No. 218, Docket 24855.

United States Court of Appeals
Second Circuit.

Argued March 2, 1960.

Decided April 12, 1960.

Isaac Salem, New York City (Lebovici & Safir, New York City, on the brief), for libelants-appellants.

Victor S. Cichanowicz, New York City (Cichanowicz & Callan, New York City, on the brief), for respondents-appellees.

Before LUMBARD, Chief Judge, and MOORE and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

This appeal, which reached us only in March 1960, is from a judgment ren-

dered by Judge Dawson in a suit in admiralty in the Southern District of New York nearly three years ago, 150 F.Supp. 708. The libelants are Greek seamen who were hired in New York by respondent, a Panamanian corporation, as part of the deck crew of the S.S. Niki, a vessel of Liberian registry owned by respondent, which was then in port on the Pacific coast. The claims were for wages from June 18 to June 23, 1952, for vacation and overtime pay alleged to be owing under the Panama Labor Code, for damages for alleged unjustified discharge, false arrest and abandonment, and for compensation for special work done by certain of the libelants in cleaning the hold of the vessel. Judge Dawson granted the claim for wages from June 18, to June 23, 1952 and denied all other claims. We agree with his conclusions save the denial of the claim for special work. The facts are so clearly and accurately set forth in his opinion that we shall dispense with any statement of them at this point and refer to them below only when necessary for clarity.

 The initial question is the choice of law. Appellants contend the rights of the parties are governed by the law of Panama, the domicile of the owner of the vessel, both because it was so agreed and, alternatively, because Panama law should govern in the absence of agreement. Respondent denies any agreement as to the governing law; it asserts that, there being no agreement, the rights of the parties are governed by the law of Liberia, the state of registry of the vessel, Title IX of whose maritime code provides "In so far as it does not conflict with any other provisions of this Act, the nonstatutory general Maritime Law of the United States of America is hereby declared to be and is hereby adopted as the General Maritime Law of the Republic of Liberia." United Nations Legislative Service, Laws Concerning the Nationality of Ships, p. 98. Judge Dawson found there was no competent proof the parties had agreed to apply Panamanian law, and we have no basis for disturbing this factual finding.

It was said in Lauritzen v. Larsen, 1953, 345 U.S. 571, 584, 73 S.Ct. 921, 929, 97 L.Ed. 1254 that, as regards the liabilities of shipowner to crew, "perhaps the most venerable and universal rule of maritime law relevant to our problem is that which gives cardinal importance to the law of the flag." See also Kyriakos v. Goulandris, 2 Cir., 1945, 151 F.2d 132, 138, 139; American Law Institute, Restatement of Conflict of Laws § 45. However, Lauritzen v. Larsen did not involve a conflict between the law of the flag and the law of the owner's domicile since these were identical, to wit, Denmark; the decision was that the United States would not apply its own statutory law, the Jones Act, 46 U.S.C.A. § 688. As noted by Mr. Justice Jackson, 345 U.S. at page 587, 73 S.Ct. at page 931, "Until recent times this factor," i. e., a clash between the law of the flag and the law of the owner's domicile, "was not a frequent occasion of conflict, for the nationality of the ship was that of its owners."

Appellants claim that when such a conflict arises, reference to the law of the domicile of the vessel's owner is required by Gerradin v. United Fruit Co., 2 Cir., 60 F.2d 927, certiorari denied, 1932, 287 U.S. 642, 53 S.Ct. 92, 77 L.Ed. 556 and other cases applying the Jones Act to seamen on vessels beneficially owned by Americans but registered under a foreign flag, and by an English case, Chartered Mercantile Bank v. Netherlands India Steam Navigation Co., 10 Q.B.D. 521 (1883). The decisions do not support this. The Gerradin case rested on the ground that the word "seaman" as used in the Jones Act must be interpreted in the light of 46 U.S.C.A. § 713 providing that every person employed or engaged to serve in any capacity on a vessel "belonging to any citizen of the United States" "shall be deemed and taken to be a 'seaman.'" While other Jones Act cases have proceeded on other grounds, see Uravic v. F. Jarka Co., 1931, 282 U.S. 234, 239, 51 S.Ct. 111, 75 L.Ed. 312, all are based on the enforcement of a law of the forum in cases with which it has

"substantial contacts," Bartholomew v. Universe Tankships, Inc., 2 Cir., 1959, 263 F.2d 437. The Chartered Mercantile Bank case did not relate to "the internal economy or discipline of the vessel," Kyriakos v. Goulandris, supra, 151 F.2d at page 138; it was a suit by a shipper for loss of goods due to a collision on the high seas between two vessels owned by an English company but registered as Dutch ships. Appellants rely on a statement by Lord Justice Brett, "I am of opinion that neither of these ships was Dutch but that both of them were English ships, * * *," 10 Q.B.D. at 534; however, the Lord Justice immediately qualified this by adding "at least for the purpose of considering whether any liability attaches according to English law to the defendants." Even as so qualified, the statement was dictum since Lord Justice Brett placed his judgment, pp. 536–537, on the basis that since the tort was committed on the high seas, the court would apply English law in any event; and the judgment of Lord Justice Lindley, in which Lord Justice Baggallay concurred, rested squarely on the point, p. 545, that "The law applicable in this country to cases of collision on the high seas is the maritime law as administered in England and not the laws of the flags."

■ However, we do not dismiss appellants' suggestion that the Jones Act cases reflect some impatience with a determination of the rights of seamen in accordance with the law of a "more or less nominal foreign registration eagerly offered by some countries." See Lauritzen v. Larsen, supra, 345 U.S. at page 587, 73 S.Ct. at page 931; Bartholomew v. Universe Tankships, Inc., supra. We do not here decide that occasions might not arise where some law having a more meaningful relation than the law of a "nominal foreign registration" ought not be chosen even when the choice is between two foreign laws rather than, as in the Jones Act cases, between a foreign law and our own.[1] The clearest case for such a reference would be when the law of the flag would itself refer to another law; but this would not really be an exception since the reference contemplated by the "venerable and universal rule" is presumably to the whole law of the flag including its conflict of laws. Assuming without deciding that this is not the only case where reference to some law other than that of the flag [2] might be called for, on no view would reference to the law of Panama be appropriate here. For a prerequisite to the forum's choosing the law of a state other than that of the flag, at least when the law of the flag would not do so, must be a showing that such state would apply its own law if the question arose in its own courts, since otherwise the forum would not be applying the whole law of that state. See McQuade v. Compania De Vapores San Antonio, S.A., D.C.S.D.N.Y.1955, 131 F.Supp. 365, 367. There is no such showing with respect to Panama in this case.

■ Appellants rely on Article 2 of the Labor Code of Panama which says the provisions of the Code "are of public order and obligate all enterprises, exploitations or establishments now existing or which in the future may be established in the Republic * * *." However, this general language must be read in the light of the detailed provisions of Title 12 dealing with work at sea and in navigable waters. There we find two Articles, 127 and 142, which use the phrase "Panamanian ship" and another, Article 135, which uses the phrase "ships

---

1. Our reference, of course, is to private and not to public international law. See Article 5 of the proposed Convention on the High Seas, embodied in the Final Act of the United Nations Conference on the Law of the Sea, Geneva, 1958, U. N. Doc. A/Conf. 13/L 53. However, we note that even this Article, which provides that "Ships have the nationality of the State whose flag they are entitled to fly," also requires "There must exist a genuine link between the State and the ship; in particular, the State must effectively exercise its jurisdiction and control in administrative, technical and social matters over ships flying its flag."

2. This would not necessarily be the law of the owner's corporate domicile, which may be quite as nominal as the law of the flag.

under the Panamanian flag," and the text strongly suggests both that these phrases were deemed synonymous and that they define the extent of the application of the entire Title as well as of the particular Articles. Also the Law of January 26, 1950 is entitled as one "by which some provisions of the Labor Code concerning the Panamanian Merchant Marine are amended and repealed and by which other measures are taken with relation to the same field"—a peculiar way of referring to vessels flying foreign flags. See also Arts. 7, 8 and 12 of this Law. In consequence, looking solely at the Labor Code and its amendment, we find libelants have not sustained the burden of showing that Panama would apply its Labor Code to a vessel owned by a Panamanian corporation but flying a foreign flag. It therefore becomes unnecessary to consider libelants' argument that the District Court was not justified in relying on Article 1080 of the Commercial Code of Panama which makes it entirely clear that a ship owned by a Panamanian corporation is not deemed Panamanian unless "registered and enrolled as such," a text which had not been introduced in evidence and apparently was found by the Judge in Berguido, The Rights of a Seaman on a Ship Under Panamanian Registry, 19 Temple L.Q. 458, 459 (1946), which he also cited.[3]

■ Since there was no evidence that Liberian law required vacation or overtime pay, the disallowance of these claims was correct.

■ The claims relating to discharge require some discussion. We think it best to consider these without relying on the ship's articles as respondent does.

For the record is unsatisfactory whether the articles were read to the libelants, few of whom can read and none of whom in fact read the articles before signing, see Brown v. Lull, C.C.D.Mass.1836, 4 Fed.Cas. 407, No. 2,018, and the Judge made no finding on this.

Disputes with respect to wages and other matters arose as soon as libelants boarded the vessel at Victoria, B. C., on June 26, 1952. On July 15, a fight developed between libelant Grivas and a messman which resulted in both being taken by State police before a justice of the peace at Coos Bay, Oregon. On July 21, while the ship was still at Coos Bay, the theft of 34 gallons of paint was discovered; Grivas was the watchman on duty and libelant Trilivas was suspected. On the ship's arrival in Portland on July 26, the master discharged these two libelants and also a seaman; the three men refused either to leave the ship or to do any further work. On July 29 the deck crew, including all the libelants and some of the engine room crew, went on strike. The three men who had been discharged picketed on board the ship carrying "On Strike" placards and the stevedores then working left the vessel as a result. Some one of the crew turned off the steam, with the result that the winches stopped and several heavy slings of lumber fell. The master called the police who ordered the three discharged seamen to leave the vessel and put the men off when they did not leave voluntarily. The master told the rest of the crew to go back to work or leave. They demanded the ship's articles be revised to provide that the master could not discharge a crew member without paying his transportation back to

3. The text of Art. 1080 of the Commercial Code can also be found in United Nations Legislative Service, Laws Concerning the Nationality of Ships, p. 129, and in Berguido and Fabrega, Manual for Masters and Seamen on Ships Under the Panamanian Flag, p. 78 (1949).

Libelants' argument is a technical one, that since this is a suit in admiralty, the court may not take notice of a foreign law which had not been proved as a fact, 3 Benedict, Admiralty, § 382 (6th ed.

1940), as a combination of Fed.R.Civ. Proc. 43(a), 28 U.S.C.A. and § 344–a(1) of the New York Civil Practice Act would have permitted in a civil action in the Southern District governed by the Federal Rules. We do not decide whether the argument is sound or whether, if it is, the case would not be appropriate for taking evidence as to Art. 1080 of the Panama Commercial Code on appeal under Admiralty Rule 45, 28 U.S.C.A.

New York. When the master declined, the libelants who were still on the vessel refused either to leave or go back to work. The master again called the police, who put them off.

The District Judge held the discharge justified because of libelants' insubordination. He relied on Korthinos v. Niarchos, 4 Cir., 175 F.2d 730, certiorari denied, 1949, 338 U.S. 894, 70 S.Ct. 241, 94 L.Ed. 550, and Southern Steamship Co. v. N.L.R.B., 1942, 316 U.S. 31, 43, 62 S.Ct. 886, 892, 86 L.Ed. 1246 the latter holding that a strike by seamen even when the vessel was tied to a dock in a safe port was not concerted activity protected by § 7 of the National Labor Relations Act 29 U.S.C.A. § 157 because it was a mutiny within 18 U.S.C. §§ 2192 and 2193, despite the contrary views expressed by a "number of courts and commentators."[4] It is questionable whether the Southern Steamship case is decisive here since Liberia incorporated in its own general Maritime Law only "the non-statutory general Maritime Law of the United States of America," although it could be argued that a statute the substance of which goes back to the earliest days of the Republic, Act of April 30, 1790, c. 9, § 12, 1 Stat. 115, and, indeed, nearly a hundred years before that to 11 & 12 Will. III, c. 7, § 8 (1698–99), was not meant to be excluded. However, the Korthinos case supports Judge Dawson's conclusion, as does The T. F. Oakes, C.C. D.Or.1888, 36 F. 442, 445.[5] Weisthoff v. American-Hawaiian S.S. Co., 2 Cir., 79 F.2d 124, certiorari denied, 1935, 296 U.S. 619, 56 S.Ct. 140, 80 L.Ed. 439, is distinguishable on the grounds that a prior statutory violation during the voyage entitled the libelants to receive their discharge and be paid their wages at New York and that there was no evidence of misconduct such as occurred here; we need not determine to what, if any, extent the authority of Weisthoff as a statement of American law, statutory and non-statutory, has been affected by Southern Steamship Co. v. N.L.R.B. We therefore sustain Judge Dawson's conclusion that the discharge was justified,[6] as well as his holdings that libelants are not entitled to damages for false arrest, Mavromatis v. United Greek Shipowners Corp., 1 Cir., 1949, 179 F.2d 310, 313, or for their subsequent detention and deportation by the immigration authorities.

There remains libelants' claim for $200 for cleaning the hold of the vessel. The District Judge found that when libelants were hired, it was agreed the deck crew would receive $200 in addition to their wages for cleaning the hold, that the deck crew was put to work doing this, and that thereafter the master told them they would not be paid the agreed sum but instead would be paid overtime at the rate of fifty cents an hour, whereupon they ceased cleaning the hold. However, the District Judge denied the claim on the ground that libelants had walked off the job and that the evidence failed to justify their failure to perform. We think that in so ruling he failed to recognize the established princi-

---

4. See Rothschild, The Legal Implications of a Strike by Seamen, 45 Yale L.J. 1181 (1936); Sapiro and Frank, Mutiny at the Dock, 25 Calif.L.Rev. 41 (1936).

5. The Blake, 1 W.Rob. 73, 166 Eng.Rep. 500 (1839), cited in the Southern Steamship case 316 U.S. at page 43, 62 S.Ct. at page 892, is not really opposed. Although Dr. Lushington held that a single instance of insolence and disobedience by an inebriated seaman while the vessel was in port should not work a forfeiture of two years' wages, he stated, pp. 87 and 88, that he would "rejoice much if the law gave me the power of mulcting him of a part of his wages as a punishment of his misbehaviour," and that he might even have decreed forfeiture in a case, p. 80, "when there is a deliberate plan concerted beforehand amongst the crew, being in a state of sobriety."

6. Since the master was thus justified in discharging all the libelants for insubordination on July 29, we are not required to consider whether his previous discharge of Grivas and Trilivas on July 26 was justified, see United States v. Huff, C.C.W.D.Tenn.1884, 13 F. 630, 634; Grivas and Trilivas were paid their wages through July 29.

ple that "where failure of a party to perform a condition or a promise is induced by a manifestation to him by the other party that he cannot or will not substantially perform his own promise \* \*, the duty of such other party becomes independent of performance of the condition or promise." American Law Institute, Restatement of Contracts § 306, see 4 Corbin, Contracts § 977.

The judgment is modified to allow libelants an additional $200 with interest from June 26, 1952 and as so modified is affirmed. No costs on appeal.