**EFRAIN DeWINDT, Plaintiff**

v.

**HESS OIL VIRGIN ISLANDS CORP., Defendant**

Civil No. 166-1973

District Court of the Virgin Islands

Div. of St. Thomas and St. John

May 9, 1978

23

ROBERT H. RUSKIN, ESQ., Christiansted, St. Croix, V.I., *for plaintiff*

ALEXANDER A. FARRELLY, ESQ. (BIRCH, DEJONGH & FARRELLY), St. Thomas, V.I., *for defendant*

CHRISTIAN, *Chief Judge*

### MEMORANDUM OPINION

This is an action by a seaman Efrain DeWindt for unpaid wages. Plaintiff brought this action on the admiralty

side of the Court against his employer, Hess Oil Virgin Islands Corporation. Plaintiff seeks recovery under the Panamanian Labor Code for overtime and vacation pay earned but not received. Alternatively, plaintiff seeks recovery for overtime pay alone on the theory that plaintiff, as a nonimmigrant laborer, was the third party beneficiary of a contract between defendant and the United States Immigration and Naturalization Service. Lastly, plaintiff seeks double wages under 46 U.S.C. §§ 596–97 (1970).

This case was consolidated for trial with three others, all filed against the same defendant on similar grounds: Marcelle Pierre, Civil No. 167-1973; Andrew Herman, Civil No. 168-1973; and Carlyle Marcelle, Civil No. 169-1973. The three companion cases were then tried to the Court on October 23 and 24, 1975; DeWindt was tried on November 23, 1976, and on December 8 and 9, 1976. As is explained more fully in this Memorandum Opinion, we find that plaintiffs are not entitled to overtime wages under the Panamanian Labor Code because of their agreements to work for fixed sums per month. As to vacation pay under Panamanian law, we award DeWindt $456.14, Pierre $408.98, and Herman $83.08. We do find plaintiffs DeWindt, Herman, and Marcelle entitled to recover overtime pay under their alternate theory: a third party contract between defendant and the United States Immigration and Naturalization Service. Lastly, we reserve the issue of double wages. This matter will be set down for hearing so that evidence as to damages may be offered in accordance with this opinion.

### FINDINGS OF FACT

1. Plaintiff, at all material times, was a citizen of Curacao, Netherlands Antilles.

2. Defendant is a Virgin Islands corporation.

26

3. Plaintiff came to the United States in 1966 as a nonimmigrant laborer under the Immigration and Nationality Act of 1952, 8 U.S.C. §§ 1101–1503 (1970), pursuant to a § 1184(c) petition filed on his behalf by defendant.

4. Defendant declared on the face of this petition that plaintiff would work forty hours per week regular time and be paid time and one-half for overtime.

5. Plaintiff began work for defendant on November 21, 1966.

6. His salary at this time was $2.50 per hour, for whatever number of hours he worked.

7. Plaintiff worked for defendant as a tug boat operator. He never had the proper operator's license. His duties included maintenance work on board, engineering, and cooking meals. He did not discipline other crew members, set work schedules, or hire new employees.

8. The tug boats on which plaintiff worked flew the flag of the Republic of Panama, but were based at St. Croix, United States Virgin Islands. Plaintiff sailed on them throughout the Caribbean, although never to Panama.

9. In July, 1969, plaintiff and defendant agreed orally that plaintiff would work for the fixed sum of $500 every two weeks.

10. Plaintiff left defendant's employ on October 18, 1971.

11. On January 19, 1972, plaintiff notified defendant by mail of the wage claim.

12. Plaintiff filed suit on April 5, 1973.

## CONCLUSIONS OF LAW

1. This is an action by a seaman for unpaid wages and for recovery in contract as a third party beneficiary.

2. The claim is cognizable within the admiralty jurisdiction of this Court.

3. Because this action concerns a dispute over pay, that is, a matter concerning a vessel's internal economy or man-

27

agement, the law to be applied in determining plaintiff's claim is the flag law of the vessels on which plaintiff served. This law is Panamanian.

4. The applicable statute of limitations to which we look to determine whether laches exists is that of the Virgin Islands, 5 V.I.C. 31(3)(A), because the Panamanian limitations statute bars merely the remedy and not the right and is therefore procedural.

5. Although the applicable limitations period of six years ran as to that part of plaintiff's wage claim which accrued from November 21, 1966, to April 5, 1967, we do not find laches, because defendant was shown not to have been prejudiced.

6. For purposes of the Panamanian Labor Code, plaintiff worked for defendant as a seaman.

7. The Panamanian Labor Code requires that a mariner laboring overtime be paid a premium, on top of his regular wages, of 25% for general overtime, 50% for work on Sundays, and 75% for overtime worked on Sundays. Panamanian Labor Code, Articles 150–52, 164–66 (Law No. 67, November 11, 1947) and Article 6 (Law No. 7, January 26, 1950).

8. Seamen may, in the alternative, be hired for a fixed sum per month. Panamanian Labor Code, Art. 125 (Law No. 67, 10-11-47).

9. Defendant contracted with plaintiff as of July, 1969 for plaintiff to work for a fixed sum per month.

10. Accordingly, plaintiff has no right to overtime under the Panamanian Labor Code for the period from and after July, 1969.

11. Plaintiff is entitled to overtime under Panamanian law for the period prior to July, 1969.

12. The Panamanian Labor Code gives seamen the right to twelve working days of paid vacation per year. Article 1 (Law No. 7, 1-26-50).

28

13. Plaintiff was shown to be entitled to $456.14 accrued vacation pay.

14. Plaintiff entered the United States as a nonimmigrant laborer under the provisions of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101–1503 (1970).

15. When the Immigration and Naturalization Service approved the Form I-129B petition, which defendant—as plaintiff's importing employer—had to file to receive permission for plaintiff to enter the United States, 8 U.S.C. § 1184(c), INS and defendant formed a contrast based upon the terms in the petition, one of which was a promise by defendant to pay plaintiff time and one-half for work beyond forty hours per week.

16. Plaintiff, the imported employee, was the intended beneficiary of this promise and has the right to enforce it. Restatement (Second) of Contracts §§ 133, 135 (Tent. Drafts Nos. 1–7, rev. and ed., 1973).

17. For reasons of public policy, plaintiff's separate wage agreements with defendant will not be allowed to affect plaintiff's rights as beneficiary of defendant's contract with INS.

18. Plaintiff is entitled to receive unpaid overtime wages at a rate of time and one-half for work past forty hours per week.

DISCUSSION

In order to derail plaintiff's main theory of recovery, defendant raises two important preliminary issues. The first is a choice of laws issue. The choice, between forum law and Panamanian law, is crucial. If, as defendant contends, we apply forum law, plaintiff may have no right to relief. Upon consideration of the issue, however, we are convinced Panamanian law should be selected. Accordingly, plaintiff's quest for relief may continue.

The choice of laws issue arises because the facts underlying this case connect with more than one jurisdiction.

This is an action for unpaid wages brought by a seaman[1] against his former employer. The plaintiff was a bonded alien during his employ;[2] his employer is a Virgin Islands corporation. The vessels on which plaintiff worked flew the flag of the Republic of Panama, were based at St. Croix, U.S. Virgin Islands, and made voyages throughout the Caribbean from the British Virgin Islands to Trinidad. They never, however, called at Panamanian ports.

 Plaintiff's claim is cognizable within the admiralty jurisdiction of this Court, since it is a claim for seamen's wages,[3] but, at least at the outset, it is unclear which law applies. The parties, as might be expected, disagree. Plaintiff sides with the law of the flag, alleging that he did not receive overtime and vacation pay to which he is entitled under Panamanian law. Defendant counters that the vessels at issue here flew the Panamanian flag purely for reasons of convenience and that in fact this case has little connection with Panama or things Panamanian.[4] Defendant concludes that, considering this, as well as the public policy expressed in the Federal and local fair labor standards statutes,[5] we must apply forum law.[6] Defendant is by no means being altruistic. The Federal statute[7] and the

---

[1] See Notes 35–39 infra and the accompanying text.

[2] See Notes 40–47 and the accompanying text. Plaintiff is a citizen of Curacao, N.A.

[3] Sheppard v. Taylor, 30 U.S. 675, 711 (1831); Annot., 29 A.L.R. Fed. 325, 400–02 (1976).
 The District Court of the Virgin Islands has the same admiralty jurisdiction as have all United States District Courts. 48 U.S.C. § 1400 (1970). And see 28 U.S.C. § 1333(1) (1970).
 The fact that the claim is based on a foreign statute does not affect our admiralty jurisdiction. The important point is the claim's relationship to the sea. Monteiro v. Sociedad Maritima San Nicolas, S.A., 280 F.2d 568, 570–71 (2d Cir. 1960), cert. denied, 364 U.S. 915 (1960).

[4] Defendant's Trial Brief at 2–3.

[5] 29 U.S.C.A. §§ 201–219 (1965); 24 V.I.C. §§ 1–23.

[6] Defendant's Final Trial Brief at 5–6.

[7] 29 U.S.C.A. § 213(12) (Supp. 1977) (exempting from coverage seamen serving on non-American vessels).

local statute[8] provide no cause of action for seamen. They would leave plaintiff with only his claim as third party beneficiary intact.

We agree with defendant that the Republic of Panama has little connection with this case and that the Virgin Islands has the most significant contacts. Further, we acknowledge the policy behind the seamen exemption in the Federal Fair Labor Standards Act. Nevertheless, for two reasons we must apply Panamanian law in the instant case. For one thing, controlling law directs us. For another, we are unwilling to give defendant a victory in this case as a result of allowing defendant to dissuade us from using the law of a flag which defendant itself admittedly selected purely for reasons of convenience.

■ Applying the law of the flag is traditional in admiralty, according to our conflicts law. "Perhaps the most venerable and universal rule of maritime law . . . is that which gives cardinal importance to the law of the flag." Lauritzen v. Larsen, 345 U.S. 571, 584 (1952). This "venerable and universal rule" may have eroded over time, but it still holds firm when the case deals with the internal economy, management, or discipline of a vessel, 2 C.J.S. Admiralty § 12 (1972). As the Supreme Court said in Lauritzen citing earlier cases,

[A]ll matters of discipline and all things done on board which [affect] only the vessel or those belonging to her, and [do] not involve the peace or dignity of the country, or the tranquility of the port, should be left by the local government to be dealt with by the authorities of the nation to which the vessel belong[s] as the laws of that nation or the interests of its commerce should require. . . .

This [is] but a repetition of settled American doctrine. 345 U.S. at 585–86. Encompassed within this doctrine are

---

[8] 24 V.I.C. § 2(5) (exempting all seamen from coverage).

seamen-employer disputes over pay, working conditions, or other aspects of the employment contract, and such disputes should be left to the law of the vessel's flag. Restatement (Second) of Foreign Relations Law § 50, Reporters' Note 2 (1965). Thus, our conflicts law looks to the law of Panama.

Grivas v. Alianza Compania Armadora, S.A., 276 F.2d 822 (2d Cir. 1960), is a seminal case in this area. Greek seamen, hired in New York by a Panamanian corporation to work on its Liberian registered vessel, sued for, inter alia, overtime pay and vacation pay allegedly due them under the Panamanian Labor Code. The court in deciding the conflicts issue refused to apply Panamanian law and selected instead the law of the flag. Judge Friendly, writing for the court, acknowledged that recent Jones Act cases reflected judicial impatience with applying the law of the flag in situations involving "nominal foreign registration," 276 F.2d at 825, and he added that, even in wage cases, there might come times when the law of the flag should be ignored in favor of some other jurisdiction's law. He pointed out, however, that in such cases, when the forum's conflicts law does not look to the law of the flag and instead chooses another jurisdiction's body of law to resolve a wage dispute, the forum must look not only to the other jurisdiction's local law but also to its conflicts law. Id. Therefore, before the forum can apply the local law of another jurisdiction, the forum must first ascertain that the conflicts law of the other jurisdiction would itself apply its own local law to the case had the case been brought initially in that other jurisdiction.

Applying this reasoning to the instant case is simple. We cannot apply our own local law, as defendant seeks, unless our own conflicts directs us to do so. As stated above, our conflicts law still directs us to follow the law

of the flag. Accordingly, applying Grivas, we would look to the law of Panama.[9]

Grivas was followed in Monteiro v. Sociedad Maritima San Nicolas, S.A., 280 F.2d 568 (2d Cir. 1960), cert. den. 364 U.S. 915 (1960); Payne v. S.S. Tropic Breeze, 274 F.Supp. 324 (D.P.R. 1967), rev'd on other grounds, 412 F.2d 707 (1st Cir. 1969); Koukorinis v. S/T Eurypyle, 214 F.Supp. 344 (E.D. Va. 1963); and Evangelinos v. Andreavapor CIA. NAV., S.A., 188 F.Supp. 794 (S.D. N.Y. 1960), aff'd, 291 F.2d 624 (2d Cir. 1961). Accord, Bassis v. Universal Line, S.A., 322 F.Supp. 449, 453 (E.D.N.Y. 1970) (following law of flag), aff'd, 436 F.2d 64 (2d Cir. 1970). We too follow Grivas. We consider it authoritative for purposes of the instant case, and in line with its reasoning we apply Panamanian local law to this plaintiff's claim.

The next preliminary obstacle thrown in plaintiff's path is the statute of limitations. Defendant alleges that plaintiff did not file the complaint within the time allowed by the applicable statute and that, as a consequence, plaintiff is barred. We are not persuaded. Defendant errs, both in its choice of limitations statutes and in its analysis of the place such statutes have in maritime actions.

Plaintiff went to work for defendant on November 21, 1966. He ended his employment on October 18, 1971,

---

[9] In fact, as Judge Friendly added, even when the forum applies the law of the flag, it must look *first* to the flag nation's conflicts law. If the conflicts law of the flag nation refers to some other jurisdiction's law, the law of the flag cannot be applied by the forum.

In the case of sub judice, no evidence was presented as to Panamanian conflicts law; therefore, we cannot say what a Panamanian court would have done with this case had it been brought there initially. Fed. R. Civ. P. 44.1 preserves a court's right to insist upon a complete presentation by counsel on a foreign law issue. 9 C. Wright and A. Miller, Federal Practice and Procedure: Civil § 2444 at 408 (1971). Accordingly, we will presume that Panamanian conflicts law is identical to our own for purposes of this case. See 9 C. Wright and A. Miller, supra at 415–16; Evangelinos v. Andreavapor CIA. NAV., S.A., 291 F.2d 624 (2d Cir. 1961).

and filed suit on April 5, 1973, nearly eighteen months later. Defendant claims that the applicable statute of limitations, set out in the Labor Code of Panama at Article 623,[10] allows a plaintiff one year in which to file[11] and that plaintiff having missed the deadline is now barred from bringing this action.[12]

■ Defendant's first error is in assuming that *any* statute of limitations could bar a claim such as the one sub judice. The case before us is brought on the admiralty side of this Court, and delay in admiralty gives rise to laches, not to violation of a statute of limitations. It is true that, in determining whether laches exists, the admiralty court will look to the state or foreign statute of limitations which would be applicable were the case not under maritime law;[13] however, the court will use the statute only as an analogy or as a guide, and the statute is in no sense controlling.[14]

■ Defendant's second error is in choosing the limitations statute to which we should look to be guided. The choice is governed by conflict of laws principles, and basic conflicts law requires that a court apply the forum's procedural rules, including statutes of limitation, when it uses

---

[10] Defendant's Exhibit F.

[11] The time begins to run "from the date of the termination of the labor relationship or the date on which the events which gave rise to such rights and actions occurred, as the workman may determine." Id.

[12] There are three companion cases to the one sub judice. In two of them, the plaintiff faces the same allegation. Andrew Herman, plaintiff in Civil No. 73-168, left his employ on January 16, 1972. He filed suit on April 5, 1973. Marcelle Pierre, plaintiff in Civil No. 73-167, left his employ on January 15, 1972. He filed suit on April 5, 1973. The fourth plaintiff, Carlyle Marcelle—Civil No. 73-169—terminated April 15, 1972, and filed suit April 5, 1973. Defendant raises no limitations bar in his case.

[13] Argyll Shipping Co. v. Hanover Insurance Co., 297 F.Supp. 125, 126 (S.D.N.Y. 1968); G. Gilmore and C. Black, The Law of Admiralty 349, 768–69 (2d ed. 1975).

[14] Gardner v. Panama R. Co., 342 U.S. 29, 30–31 (1951); Gruca v. United States Steel Corporation, 495 F.2d 1252, 1258–59 (3d Cir. 1974); Esso Transport Co., Inc. v. Terminales Maracaibo, C.A., 356 F.Supp. 1367, 1369 (S.D.N.Y. 1973); Argyll Shipping Co. v. Hanover Insurance Co., 297 F.Supp. 125, 128 (S.D.N.Y. 1968).

the substantive law of another jurisdiction. G. Gilmore and C. Black, supra note 13, at 777; see Restatement (Second) of Conflict of Laws § 142 (1971). This rule is qualified to the extent that the forum will not hear a case if it would be barred in the jurisdiction of the applicable substantive law by a limitations statute "which bars the right and not merely the remedy." Restatement (Second) of Conflict of Laws § 143; G. Gilmore and C. Black, supra note 13, at 777. Clearly then, defendant's choice is correct only if we find that the Panamanian statute of limitations bars the right and not merely the remedy.

■ Distinguishing right from remedy is usually no easy task; however, our labor is lightened, because there is a case directly on point. In Bournias v. Atlantic Maritime Co., 220 F.2d 152 (2d Cir. 1955), the plaintiff seaman sued for unpaid wages allegedly due under the Panama Labor Code. Defendant raised the Labor Code statute of limitations, Article 623, as a bar. The Second Circuit held that the statute did not bar plaintiff's claim. The opinion pointed out that, applying choice of laws rules to the issue, the forum court could not look to Article 623, because it was not aimed specifically at the particular rights which plaintiff was trying to enforce. That is, it barred merely the remedy and not the right; therefore, a non-Panamanian court would have to consider it procedural and could not use it. We accept this as determinative for our purposes.[15]

■ The defendant in the instant case placed great emphasis upon the testimony of its Panamanian legal expert,

---

[15] Apparently, Article 623 was amended at some point after Bournias was decided. The Article as set out in that case, 220 F.2d at 154, differs from the Article as presented at trial in the instant case, defendant's Exhibit F. We find the difference immaterial for our purposes. Article 623 apparently continues to apply to a broad spectrum of workers' rights. Cf. Bournias, 220 F.2d at 157. Defendant's own expert Dr. Hoyos testified on cross examination as to the breadth of the Article's coverage.

but we are as unmoved as was the Bournias court, 220 F.2d at 157. The forum uses its own law, not the law of the foreign jurisdiction, to determine whether a foreign limitations statute bars the right and not merely the remedy. Restatement (Second) of Conflict of Laws § 143, Comment b. Accordingly, we hold Article 623 to be procedural and turn instead to the applicable Virgin Islands statute of limitations, 5 V.I.C. § 31(3)(A).

■ Taking the statute as a guide, we conclude that laches does not obtain even though the limitations period ran as to part of plaintiff's claim. The statute allows a plaintiff six years in which to bring suit. Id. This span of time covers so much of plaintiff's wage claim as accrued from April 6, 1967, to the day he left defendant's employ.[16] Because the analogous statute of limitations had not run as to this part of plaintiff's wage claim, defendant had the burden of proving laches. Churma v. United States Steel Corp., 514 F.2d 589, 593 (3d Cir. 1975); Gruca v. United States Steel Corp., 495 F.2d 1252, 1259 (3d Cir. 1974). This means that defendant had to prove inexcusable delay in light of the case's equities and prejudice to itself, Churma, supra. We find nothing in the evidence which would support either element and accordingly conclude that defendant did not carry this burden.

■ Wages payable *prior* to April 6, 1967, lie outside of the limitations period; however, we decline to find laches even as to this part of the wage claim. Since the

_____

[16] If an employee's wages are due at regular intervals—the case here—a separate limitations period applies to each installment of wages and runs from each payday. Mid-Continent Petroleum Corp. v. Keen, 157 F.2d 310, 316 (8th Cir. 1946); Morris v. Russel, 236 P.2d 451, 456 (Utah 1951); Annot., 7 A.L.R.2d 198, 199 (1949). Since plaintiff went to work for defendant on November 21, 1966, and filed suit on April 5, 1973, the applicable statute of limitations ran on wage installments payable from November 21, 1966, to April 5, 1967. Wages accruing from April 6, 1967, onwards were within the limitations period.

applicable statute had run, the burden of disproving laches was plaintiff's, Churma, supra; Gruca, supra; but we find that plaintiff met this burden. Plaintiff adduced evidence that on January 19, 1972—prior to the running of the limitations period as to any wage installment—he notified defendant of his claim.[17] Defendant was thus made aware of its potential liability early on. We believe this precludes defendant from now claiming prejudice.[18]

Having disposed of the preliminary issues, we now turn to the heart of the case: the question of plaintiff's rights under the Panama Labor Code. We will deal first with plaintiff's right to overtime wages. We find that the Code entitles plaintiff to some recovery but not nearly as much as he seeks.

Plaintiff worked for defendant from November 21, 1966, until October 18, 1971. At his trial, plaintiff testified that his initial salary was $100.00 per week based upon a forty hour week; this equals $2.50 per hour. He also received $2.50 per hour for any overtime worked. According to his further testimony, he very rarely worked as little as forty hours per week. In July, 1969 defendant switched plaintiff to a straight salary, paying him $500 every two weeks regardless of the hours plaintiff worked. Plaintiff testified that in fact he worked a similar number of hours under the new pay system as he had under the old.[19]

---

[17] Plaintiff's Exhibit 34.

[18] Similar reasoning applies to the plaintiffs in the companion cases. All filed suit on April 5, 1973. All were hired within six years of that date: Herman on February 26, 1971; Pierre on February 11, 1970; and Marcelle on July 2, 1970. The analogous limitations period not having run as to any of their wage installments, and defendant not having carried the burden of proving laches, see Churma v. United States Steel Corp., 514 F.2d 589, 593 (3d Cir. 1975); Gruca v. United States Steel Corp., 495 F.2d 1252, 1259 (3d Cir. 1974), we decline to find it.

[19] The Master's Report, prepared pursuant to this Court's Order dated December 17, 1975, is in accord with plaintiff's testimony.

The Panamanian Labor Code[20] requires, subject to a significant exception, that an employee laboring overtime be paid a premium on top of his regular wages. The appropriate code articles applicable during plaintiff's employ state,

## TITLE XIII

### WORK SHIFT

Article 150. The day is divided into the following shifts or working periods:

(a) Day work: From 5 a.m. to 7 p.m.

(b) Night work: From 7 p.m. to 5 a.m.

Article 151. Hours of work within the above-mentioned working periods shall be classified as day shift and night shift respectively.

A shift comprising more than three hours within the night working period will be considered a night shift.

A mixed shift is that comprising hours in both periods of work.

Article 152. The maximum day shift shall be eight hours and the corresponding workable week up to forty-eight hours.

A maximum night shift shall be seven hours and the corresponding workable week up to forty-two hours.

The maximum duration of the mixed shift shall be seven hours and a half, and the corresponding workable week up to forty-five hours.

The period of rest between half shifts shall not be less than half an hour.

## Law Number 67 (November 11, 1947).

Article 6. Every crew member of a vessel whose effective work time exceeds the legal limits or less because of contractual

---

[20] The Panamanian Labor Code was adopted, effective November 11, 1947, by Law No. 67 of the National Assembly of Panama. (Introduced in evidence as plaintiff's Exhibit 16.) The Code was amended by Law No. 7, effective January 26, 1950 (Defendant's Exhibit A) and by Cabinet Decree No. 252 of December 30, 1971, effective February 18, 1972. (Introduced as plaintiff's Exhibit 11 in the trial of the three companion cases to DeWindt.)

clauses, shall be entitled to be paid overtime with a surcharge of not less than 25% on the wages accrued.

## Law Number 7 (January 26, 1950).[21]

### TITLE XIV
### COMPULSORY REST

Article 164. The compulsory weekly rest should be given preferably on Sundays. However, workers may be granted a full rest period of twenty-four consecutive hours on a different day, in exchange for the Sunday rest, in accordance with the article that follows:

Article 165. The agreements contemplated in the foregoing article shall be considered licit in the case of tasks whose interruption is not possible.

1. Because of evident and urgent necessity of carrying them out.

2. Because their technical or practical character requires their continuity.

3. Because the interruption of such work on Sundays may occasion grave harm to public interests or health.

4. Because of engaging in agricultural work or in the cattle industry.

Paragraph: These provisions shall also apply when it is intended to work on a national holiday.

Article 166. Work on Sundays or on national holidays shall be paid for with fifty percent (50%) extra over the regular workday pay, without prejudice to the worker's right to obtain any other day of rest during the week in accordance with Article 164.

## Law Number 67 (November 11, 1947).[22] In general then, plaintiff would be entitled to a 25% premium for over-

---

[21] Law No. 67 at Article 154 sets the general overtime rate for workers covered by the Panamanian Labor Code. Law No. 7 at Article 6 amended the Code to provide a lower rate for crewmen. See Law No. 7 at Article 12 ("The provisions pertaining to this law shall be applicable only to Panamanian vessels engaged in international trade and for the purposes of this law Articles 128, 142 and 154 are hereby amended and . . . Articles 127, 170 and 644 of the Labor Code are hereby subrogated.")

[22] Law No. 7 does not affect Law No. 67 at Articles 164–66. See Law No. 7 at Article 12, supra note 21.

time worked during the week, to a 50% premium for regular work on Sunday, and to a premium of 75% (50% + 25%) for overtime worked on Sunday.[23]

■ The problem plaintiff faces is that there exists an exception to this general framework. This exception is found at Law Number 67, Article 125, under the Code title "Labor at Sea and in Navigable Waters." It states that "The engagement of seamen may be contracted for: (1) a fixed sum per month. . . ." Article 125 must be construed together with the other articles.[24] Doing so, a consistent plan appears. The Code allows an employer of seamen two options. He can hire them by the hour, in which case they must be paid a premium for working overtime or on Sunday, or he can hire them at a fixed rate, in which case he need not pay the premium. The accuracy of this analysis is further strengthened by the fact that the overtime and Sunday wage provisions apply generally to all employees, save civil servants and certain agricultural workers,[25] while the fixed rate provision applies specifically to seamen. Clearly, it was meant to provide an alternative for the employers of seamen, hence its language that seamen "*may* be contracted for . . . a fixed sum" (emphasis added).

We find that defendant made use of this alternative, contracting orally with plaintiff, in July, 1969, for plaintiff to work for the fixed sum of $500 every two weeks; as a consequence, we will deny that part of the overtime claim accruing from and after July, 1969.[26] According to the testimony adduced, plaintiff and defendant had no written employment contract, either before or after July, 1969,

---

[23] Bassis v. Universal Line, S.A., 322 F.Supp. 449, 455–56 (E.D.N.Y. 1970), aff'd., 436 F.2d 64 (3d Cir. 1970).

[24] They deal with the same subject matter. See 82 C.J.S. Statutes § 366 (1953).

[25] Law No. 67, Article 2.

[26] This result requires that, within the language of Article 125, we find plaintiff to have been a seaman. See Notes 35–39 infra and the accompanying text.

40

even though plaintiff worked steadily for defendant. The existence of a fixed sum contract was proved, however. Under the Panamanian Labor Code, in the absence of a written contract it is presumed that the employee's version of the contract terms is correct,[27] but this presumption may be rebutted by evidence to the contrary.[28] Plaintiff himself provided this evidence. The Court Reporter's notes show that plaintiff made the following responses to questions put to him on direct examination.

> Q. What happened in June [sic], 1969 if anything with respect to your wages—
> A. Well, in 1969, July, they had a new boat that came in The Limetree Bay, Canegarden Bay, and I was told they were going to change my salary to $500 every two weeks, plus housing.
> . . . .
> Q. Now, what were your overtime payments starting with July of 1969, if any?
> A. Well, there wasn't any overtime at that time.
> Q. There weren't [sic] any overtime pay?
> A. No.
> Q. You were now working on a straight time basis?
> A. Yes.

Upon cross examination, plaintiff continued.

> Q. [T]he change from hourly to monthly came to you as a complete surprise?
> A. Yes.
> . . . .
> Q. [D]id you enter any objections to Captain Amjur or any of your supervisors?
> A. I went to Captain Amjur, he said this way I was going to earn more money and work less hours than I used to work.
> . . . .
> I told him I find out I was working the same or more hours and making just a little less than I used to make.

---

[27] Law No. 67, Article 19.
[28] Law No. 67, Article 20.

Q. Did you ask to go back to hourly pay?
A. No.

■ In fact, plaintiff continued working, accepting his $500 every two weeks. It was over two years later that he finally left defendant's employ. By this conduct, plaintiff manifested his assent to the exchange and formed a fixed sum employment contract with defendant. Restatement (Second) of Contracts §§ 19(1), 21, 52(1) (Tent. Drafts Nos. 1–7, 1973).[29] Wages accruing after this accordingly fall under the provisions of Article 125.[30]

The period prior to July, 1969 is not covered by the fixed sum contract. Defendant paid plaintiff an hourly wage for this period and paid him at the same rate regardless of whether plaintiff was working regular time, Sunday time, or overtime. Plaintiff is entitled to recover for this period the premiums allowed by the Code. We cannot, however, award anything for this period. Both the Master's Report and plaintiff's exhibits refer only to the period after July, 1969. We have insufficient evidence upon which to base an award and will therefore not do so at this time.[31]

■ Turning to the question of vacation pay, we reach a different result. We believe that the fixed sum employment contract does not bar plaintiff's statutory right to vacation pay. The contract does bar the statutory right to overtime and Sunday pay, but this is so because those

[29] The restatements are rules of decision in Virgin Islands Courts, 1 V.I.C. § 4 (1967). Cf. Varlack v. SWC Caribbean, Inc., 550 F.2d 171, 179–80 (3d Cir. 1977).

[30] Plaintiffs Pierre, Herman, and Marcelle in the companion cases, Civil Nos. 73-167 to 73-169, faced similar salary changes in July, 1969. We find evidence that each contracted similarly, to work for a fixed sum per month, and may not now seek overtime for the period after July, 1969.

[31] For the period prior to July, 1969, plaintiff may recover either under the Panamanian Labor Code or under the contract beneficiary theory discussed infra. See notes 40–47 and the accompanying text. Plaintiff would be entitled to the larger recovery, whichever that might be. This applies as well to the plaintiffs in the companion cases.

provisions deal with wage rates, and the fixed sum contract is an alternative form of paying wages. The vacation provision, on the other hand, does not concern the manner in which wages are paid. It simply states

Article 1. All crew members of a vessel shall be entitled, after twelve months of uninterrupted service, to paid annual vacation leave, the duration of which shall be:

(a) In the case of the master and officers, not less than 18 working days per year of service.

(b) In the case of the other crew members, not less than 12 working days per year of service.

Law No. 7 (January 26, 1950). Accordingly, we hold plaintiff entitled to recover for unreceived paid vacation leave.

Calculating the dollar amount due plaintiff proved difficult. First, no evidence was entered pertaining to the period prior to July, 1969. If plaintiff is entitled to vacation pay for this period, it was not shown at trial. Second, the exhibit[32] submitted to prove the vacation pay due plaintiff for the period from July 1, 1969, until October 18, 1971, uses the wrong calculation. It bases its results on Law No. 67, Article 170, rather than on Law No. 7, Article 1. The latter subrogated the former on January 26, 1950. See Note 21 supra. Plaintiff's witness Mr. Bronstein calculated that, for the twenty-seven months and eighteen days plaintiff worked, he was entitled to seventy-three vacation days. In reality, using Law No. 7, Article 1(b),[33] plaintiff was entitled to 27.6 vacation days. Plaintiff's Exhibit 22 shows that plaintiff took nineteen of these days; for the remainder, using Mr. Bronstein's calculations, plaintiff is due:

---

[32] Plaintiff's Exhibit 22.

[33] We use the section applicable to seamen, because we consider DeWindt to have been a seaman. See Notes 35–39 infra and the accompanying text.

(27.6 − 19) days accrued × 8 hours/day × $6.63 wages/ hour. This amounts to $456.14.[34]

Plaintiff may recover this amount in addition to what he takes under the contract beneficiary theory discussed infra. As noted above, vacation benefits are not in the same category as ordinary and overtime wages, and the contract beneficiary theory deals solely with wages.

Before turning to the remaining issues, we feel it necessary to expound our decision above that DeWindt worked for defendant as a seaman. Plaintiff and defendant devoted a great deal of effort to this issue and seemed to feel that DeWindt, who was admittedly at least a "boat operator,"[35] could not recover under the Panama Labor Code if he were considered a master, as opposed to a seaman.[36] This misses the point. The issue is important for two reasons: first, for determining the amount of vacation pay and, second, for judging plaintiff's ability to sign a fixed sum contract.

The overtime and Sunday pay provisions of the Panama Labor Code apply equally to all mariners, masters as well as seamen. Law Number 7, Article 6 awards overtime pay

---

[34] The figures for the companion cases, using plaintiff's exhibits nos. 23–25, are as follows:

Marcelle Pierre worked from 2/11/70 to 1/15/72. He is due, 23.1 days accrued × 8 hours/day × $3.81 wages/hour equalling $704.09, less $295.11 paid, for a net total of $408.98.

Andrew Herman worked from 2/26/71 to 1/16/72. He is due, 10.7 days accrued × 8 hours/day × $3.81 wages/hour equalling $326.14, less $243.06 paid, for a net total of $83.08.

Carlyle Marcelle worked from 7/2/70 to 4/15/72. He is due nothing, as his calculation shows, 21.5 days accrued less 31 days taken.

[35] Plaintiff's Exhibit No. 15, Answer No. 1(b).

[36] The master of a ship is her commander, the one having chief charge of her government, command of her crew, and general care of her and her cargo as the owner's agent. He commonly is called the "captain." Black's Law Dictionary 1127 (rev. 4th ed. 1968).

The Master is the person in charge of the vessel. All crew members should obey him as far as service rendered is concerned.

The Master is the person in whom public authority has been delegated for the preservation of order in the vessel and safety of passengers, sailormen and cargo.

Panamanian Code of Commerce, Article 1121 (July 1, 1917) (Exhibit A to defendant's Final Trial Brief).

to "[e]very crew member of a vessel," and Law No. 67, Article 123 declares the crew to be composed, inter alia, of the master, officers, and seamen. Accord, Law No. 67, Article 149. Similarly, the Sunday pay provision, Law No. 67, Article 166, applies to all workers covered by the Code. The distinction between master and seaman becomes important, however, when we turn to Law No. 67, Article 125, which allows fixed sum employment contracts. This provision applies only to seamen.[37]

 Accordingly, in order to apply Article 125 to DeWindt, it is necessary that we find DeWindt to have been employed as a seaman. The evidence supports such a finding. Despite the fact that defendant declared plaintiff to be a "Tug Boat Captain" from January 8, 1970, onwards, Plaintiff's Exhibit No. 15, Answer 1(b), it is clear that plaintiff's duties and responsibilities never in fact elevated him to so lofty a position. Plaintiff operated defendant's tug boats, but, as he testified, he never had the proper license to do so. Furthermore, aside from operating the boats, his duties included maintenance work on board, engineering, and even taking turns cooking meals. In fact, he had little authority. His superior, Captain Amjur, was responsible for crew discipline, and Amjur set the work schedules, although DeWindt did set watches during the infrequent trips down island. Amjur and Amjur's superior, Captain Carlsen, were responsible for hiring crew members. There was testimony that DeWindt did not have the authority even to replace an ill seaman without first getting permission from his superiors. This is not the picture of a man in charge of a vessel, it portrays just another

---

[37] The Spanish original, in plaintiff's Exhibit No. 16, uses the word "marinos." Plaintiff mistakenly translates this as "crewmen". The correct translation is "seamen." Cassell's Spanish Dictionary 549 (1968). Accord, Law No. 67, Article 149 (in the Spanish), which states that "marino" (seaman) does not include "El Capitán" (Captain). See Cassell's at 180.

45

employee. DeWindt himself testified that to the other seamen on the tug he was never "Captain DeWindt" only "DeWindt." We are inclined to agree. A master, after all, is a person in charge, the agent of the owner; he is someone with authority.[38] DeWindt never attained such a level.[39]

Plaintiff offered this Court two possible avenues to his recovery. The first—the Panamanian Labor Code—effectively led plaintiff nowhere. The second avenue is an alleged third-party beneficiary contract between defendant and the United States Immigration and Naturalization Service [hereinafter cited as INS]. We find that the latter entitles plaintiff to a recovery. We base this finding on a determination that plaintiff was in fact the intended beneficiary of the contract between defendant and INS and therefore may enforce certain provisions of that contract.

To understand this theory of recovery requires, first, a brief explanation of INS procedure. When plaintiff came to work for defendant, he was a citizen of Curacao, N.A. He entered the United States under the Immigration and Nationality Act of 1952, 8 U.S.C. §§ 1101–1503 (1970), as a nonimmigrant laborer,

an alien having a residence in a foreign country which he has no intention of abandoning . . . who is coming temporarily to the United States to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country. . . .

8 U.S.C. § 1101(a)(15)(H)(ii). To obtain this status, defendant—as plaintiff's importing employer—had to petition the United States Attorney General. 8 U.S.C. § 1184(c).

---

[38] Note 36 supra. See Wandtke v. Anderson, 74 F.2d 381 (9th Cir. 1934); The A. H. Chamberlain, 206 F. 996 (E.D.N.Y. 1913). See also Magnolia Towing Company v. Pace, 378 F.2d 12 (5th Cir. 1967).

[39] The plaintiffs in the companion cases need not meet this issue. They were admittedly employed as seamen.

46

The petitioning process requires that the employer file a Form I-129B (the petition) with INS, together with a certification from the designated representative of the Secretary of Labor stating that comparable workers cannot be found within the United States and that the employment of the nonimmigrant will not adversely affect wages and working conditions in the United States. 8 C.F.R. §§ 214.2(h)(1, 3)(1977); 20 C.F.R. § 621 (1977). The process further requires that the importing employer list the nonimmigrant's wages per week, hours per week, and overtime rate on the petition itself; defendant listed plaintiff's overtime rate as time and one-half for work beyond forty hours per week.[40] Upon INS's approval of the petition, the nonimmigrant may then enter the United States.[41]

■ INS's approval—accepting the offer the employer makes through the petition—is the final step, forming a contract between INS and the employer based upon the terms in the petition. To ascertain what rights the imported employee has under this agreement, we next look to the applicable Virgin Islands contracts law, contained in the tentative drafts of the Restatement (Second) of Contracts.[42] In general, a person other than a contracting party may enforce a promise in the contract if the person is an intended beneficiary of the promise. Restatement (Second) of Contracts § 135 (Tent. Drafts Nos. 1–7, rev. and ed., 1973). Performance of a contract often benefits third persons generally, but

[40] See Plaintiff's Exhibit No. 9, Form I-129B, boxes 8A and 9. This is a photocopy of the petition submitted in 1968 by defendant on plaintiff's behalf listing overtime at time and one-half. Defendant did not contend at trial that it ever gave INS different figures for plaintiff.

[41] See 22 C.F.R. § 41.6 (1977). When coming to work in the United States Virgin Islands, nationals of most Caribbean islands need not obtain visas.

[42] See Varlack v. SWC Caribbean, Inc., 550 F.2d 171, 179, 180 (3d Cir. 1977).

47

(1) [u]nless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . .

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Id. § 133. These rules apply where one contracting party is a governmental entity. Id. § 145 (1).[43]

Applying these rules to the instant case, and considering both the manner in which an importing employer brings the employee into the Virgin Islands as well as the policy behind the admission of nonimmigrant laborers, we hold that:

(1) When INS approves the petition filed by an importing employer, it creates a contract between them under which the employer agrees inter alia to pay the overtime rate listed in the petition, and (2) the imported employee is the intended beneficiary of this promise and may sue to enforce it.

That the petitioning process creates a contract is clear. There is an offer by the employer, acceptance by INS, and consideration. It is equally clear that the employer promises to pay the overtime rate listed in the petition and that it is intended for the employee to be able to enforce this promise. Consider the policy underlying the statute. While the raison d'etre for allowing the importation of nonimmigrant laborers is to ease temporary labor shortages in

---

[43] However, the case sub judice must be distinguished from the case where a private person contracts with a governmental entity for the private person to supply a service *to the general public*. In such a case, typified by Restatement (Second) of Contracts § 145, Illustrations 1 and 2, before a *member of the public* can recover as an intended beneficiary, a standard which is higher than that imposed in the general run of beneficiary cases must be met. Id. § 145 (2). See, Harvey Aluminum Inc. v. DeChabert, 266 F.Supp. 143, 147–49 (D.V.I. 1967); Weinberger v. New York Stock Exchange, 335 F.Supp. 139 (S.D.N.Y. 1971). The plaintiff in the instant case has a claim under the general rule, § 133. He is not suing as a member of the public, and defendant did not contract with INS to supply a service to the general public.

particular areas of the United States economy, H.R. Rep. No. 1365, 82d Cong., 2d Sess. (1952), reprinted in [1952] U.S. Code Cong., & Ad. News 1697–98, the underlying policy is to protect domestic workers. Id. at 1705. The Immigration and Nationality Act states on its face that nonimmigrant laborers cannot be admitted unless

(A) there are not sufficient workers in the United States who are able, willing, qualified . . ., and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and (B) *the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed.* (Emphasis added.)

8 U.S.C. § 1182(a)(14) (1976). Furthermore, the employer's interest in obtaining nonimmigrant employees has been held to be subordinate to the interest in protecting domestic workers. Pesikoff v. Secretary of Labor, 501 F.2d 757, 760 (D.C. Cir. 1974), cert. denied, 419 U.S. 1038 (1974). Indeed, in 1965 Congress amended § 1182 (a)(14), to strengthen the safeguards protecting American workers, by placing on the alien the burden of proving no adverse effect. Pesikoff, 501 F.2d at 761–62. See S. Rep. No. 748, 89th Cong., 1st Sess. (1965), reprinted in [1965] U.S. Code Cong. & Ad. News 3329, 3333–34.

The government ensures at the outset that employment of the nonimmigrant "will not adversely affect the wages and working conditions of the workers in the United States," 8 U.S.C. § 1182(a)(14), by requiring the importing employer to disclose what he intends to pay the alien.[44] An importing employer's petition will not be approved if the wage rates listed are below comparable rates for domestic workers. 29 C.F.R. § 60.6(a) (1976); see 20 C.F.R.

---

[44] The petition required by 8 U.S.C. § 1184(c) is filed on INS Form I-129B. 8 C.F.R. § 214.2(h)(1). Boxes 8, 8A, and 9 on the form require the alien's wage rates. See Plaintiff's Exhibit No. 9.

49

§ 621.3(b) (1977). The government's interest in protecting domestic wage rates clearly continues, however, even *after* the petition is approved and the alien begins work. If the interest did not continue, unscrupulous employers would be free to violate the promises made in the petition, pay aliens lower wage rates, and thereby depress domestic wage rates. The congressmen who drafted the Immigration and Nationality Act, as well as the INS which enforces it, clearly would not want such a situation.[45]

It is obvious that INS alone cannot enforce the listed wage rate for each alien admitted to the United States as a nonimmigrant laborer. Nevertheless, the nonimmigrants' wage rates must be policed in order to effectuate the statutory policy. It requires no great mental leap to conclude that, when the importing employer and INS reach their agreement to bring the alien into the United States, it is INS's intention that the alien be the beneficiary of the promise as to wage rates, so that the alien may *himself* enforce the promise. See Restatement (Second) of Contracts §§ 133 and 135. As a point of interest, it should be noted that in setting out the petitioning procedure for nonimmigrant laborers, the regulations describe the alien as the "beneficiary" of the petition. 8 C.F.R. § 214.2(h)(1).

The fact that our research has turned up no case on point seems to be stark testimony to the nonimmigrant laborer's tenuous position in the United States. We take comfort from favorable rulings in analogous areas. For example, in United States v. Morley Const. Co., 98 F.2d 781, 788–89 (2d Cir. 1938), cert. denied, 305 U.S. 651 (1938), a construction company contracted with the Veterans Administration to build it a hospital. As a matter of public policy, the contract required that laborers employed by the company, or its subcontractors, be paid wages of

---

[45] Alexander Hanschen, the INS supervisory officer for St. Croix, testified to the service's strong interest in preventing this.

not less than the prevailing rate. The workers were paid less than the prevailing rate and sued. Judge Learned Hand, citing the Restatement (First), declared that the workers were third-party beneficiaries of the wage rate promise and could, therefore, enforce it. In Fata v. S.A. Healy Co., 289 N.Y. 401, 46 N.E.2d 339 (1943), Chief Judge Lehman faced an action based on a similar provision in a contract between plaintiff's employer and New York City's Board of Water Supply. As did his brother Hand, Judge Lehman allowed the worker to sue as third-party beneficiary and to enforce the wage rate promise. Similarly, there are numerous cases holding that an employee is the third-party beneficiary of a collective bargaining contract between his union and his employer and may sue as an individual to enforce its provisions. Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 348 U.S. 437, 460 (1955); 2 S. Williston, Law of Contracts § 379A (3d ed. 1959).

Plaintiff's rights as third-party beneficiary are not affected by any agreements, express or implied, that plaintiff may have made directly with Hess. As stated above,[46] plaintiff and defendant had no separate, written wage agreements, aside from the third-party contract; however, we held above that plaintiff and defendant in July, 1969 made an oral wage agreement for plaintiff to receive the fixed sum of $500 every two weeks. This oral agreement barred plaintiff's rights to overtime under the Panama Labor Code.[47] It is true that, in general, the beneficiary of a third-party contract may make a separate agreement which affects his rights under the third-party contract. Restatement (Second) of Contracts § 140(4), comment c; 4 A. Corbin, Contracts § 811 at 235 (1951). Never-

---

[46] See notes 26–29 supra and the accompanying text.

[47] See notes 24–29 supra and the accompanying text. Article 125 of the Code explicitly allows such a contract, and Articles 19 and 20 allow oral terms to be proven by evidence.

theless, we hold that the July, 1969 agreement, or any other between plaintiff and defendant, did not have this effect, because plaintiff did not have the power to waive his third-party rights. "Where a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed where it would thwart the legislative policy which it was designed to effectuate." Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 704 (1945); Morley Const. Co., 98 F.2d at 788–89; see Restatement of Contracts § 512 (1932). Clearly, were importing employers able to violate the terms of their contracts with INS by making separate contracts with their imported employees (for lower wages the policy underlying the importation of nonimmigrant laborers would be frustrated.

We decline at this time to calculate the amount of plaintiff's damages, because the evidence submitted is insufficient. Plaintiff's Exhibit Number 33 offers a figure of $100,344.47, based on the beneficiary theory and using the work record calculations in the Master's Report;[48] however, we do not know if this figure is the net amount now due plaintiff, or if this is the total amount he could possibly have earned, and from which we must first subtract the amount he actually received. In any event, this figure is admittedly inaccurate to the extent that it treats all Saturday work as straight time, when in fact Saturday work may be overtime if beyond forty hours. Plaintiff's Post Trial Memorandum at 21. Further, it does not cover the period prior to July, 1969. Plaintiff is entitled to the salary listed in the petition for any week in which he worked forty hours or less, he can receive overtime at time and one-half for any hours worked in excess of forty during a

---

[48] The Master was appointed by the Court's Order of 12/17/75 to calculate plaintiff's work time, using the ship's logs. His report, to which defendant did not formally object, is conclusive.

given week. Accordingly, we will schedule a hearing, so that plaintiff can offer proof to our satisfaction.[49]

Turning to the question of the double wage penalty, 46 U.S.C. §§ 596–97 (1970), we decline at this point to resolve the issue and will instead reserve judgment until after the hearing on damages.

---

[49] The hearing will also give plaintiff's counsel the opportunity to introduce similar evidence in two of the three companion cases: Herman and Marcelle, Civil Nos. 73/168 and 73/169. In the third case, Pierre, Civil No. 73/167, the plaintiff was not a nonimmigrant laborer and therefore cannot recover under this theory. As to plaintiff Herman, although we find from the evidence that he was a nonimmigrant laborer, no evidence was submitted as to his overtime rate or the hours per week he would work at straight time. Plaintiff's Exhibit No. 1, submitted in the first trial, is the MA-VI-1 form for Herman, but it does not give his overtime information. The hearing will give counsel opportunity to show this. For Marcelle, counsel submitted the ES-575B form, Plaintiff's Exhibit No. 7 in the first trial. This provides sufficient information, listing his overtime at time and one-half after forty hours. Marcelle's petition, form I-129B, was not submitted but we hold form ES-575B to be sufficient.