UNITED STATES of America,
Plaintiff-Appellee,

v.

Earl WATSON, Tony Maxwell and Mae Lillian Brown, Defendants-Appellants.

Nos. 77–1575 to 77–1577.

United States Court of Appeals,
Tenth Circuit.

Feb. 15, 1979.

Rehearing and Rehearing En Banc
Denied May 1, 1979.

---

**5.** Receiving as *quid pro quo,* perhaps, some additional furniture which they really did not want to buy.

**1332**

Joel L. Wohlgemuth of Prichard, Norman, Reed & Wohlgemuth, Tulsa, Okl., for defendants-appellants.

Kenneth P. Snoke, Asst. U. S. Atty., Tulsa, Okl. (Hubert H. Bryant, U. S. Atty., Tulsa, Okl., on the brief), for plaintiff-appellee.

Before HOLLOWAY and McKAY, Circuit Judges, and STANLEY, District Judge.*

HOLLOWAY, Circuit Judge.

Defendants-appellants Watson, Maxwell, and Brown have taken these timely direct appeals from convictions under 21 U.S.C. § 846, conspiracy to commit offenses defined in 21 U.S.C. § 841(a)(1),[1] (distributing or possessing with intent to distribute, etc., a controlled substance) and in 21 U.S.C. § 843(b), (use of a communication facility to facilitate the commission of offenses

---

* The Honorable Arthur J. Stanley, Jr. of the District of Kansas, sitting by designation

1. 21 U.S.C. § 841(a)(1) provides:

 (a) except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

 (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

 . . .

Controlled substances are regulated by the Attorney General under the authority vested in him by 21 U.S.C. §§ 811–812. They include substances such as heroin, cocaine, and marihuana. See 21 U.S.C. § 812(c).

defined in 21 U.S.C. § 841(a)(1))[2] and from convictions of each appellant of a substantive offense under § 843(b) of such use of a telephone. Appellants' major contentions are that tape recordings of intercepted telephone conversations and transcripts thereof were improperly permitted to be used against them, that there was insufficient proof to support their convictions, and that there was, in any event, no single conspiracy proved as charged. Several other arguments are also made, and we will discuss all those having some substance.

The indictment charged fifteen individuals, including appellants, with conspiracy knowingly and intentionally to possess with intent to distribute and to distribute heroin and cocaine, and to use a telephone to facilitate commission of such offenses. In addition, appellants were each charged with one count of knowingly and intentionally using a communications facility, i. e., a telephone, to facilitate the accomplishment of and to accomplish the possession with intent to distribute and the distribution of heroin and cocaine. The conspiracy involved a California supplier, "Pete" Anderson, a Tulsa wholesaler, John Thompson, assisted by one Karen Brooks, and several retailers or street dealers, including appellants Watson, Maxwell, and Brown.

Appellants claim there was insufficient evidence in this case to support their convictions. Viewing all the evidence, together with all reasonable inferences therefrom, in the light most favorable to the government, as we must, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; *United States v. Krohn*, 573 F.2d 1382, 1385 (10th Cir.), *cert. denied sub nomine Hahn v. United States*, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792; *United States v. Twilligear*, 460 F.2d 79, 81–82 (10th Cir.), we must disagree with this contention. Yet, since appellants have challenged the admission in evidence of certain tape recordings of telephone intercepts, and since without those recordings the evidence might not support the adverse jury verdicts rendered, we turn first to a consideration of the various issues involving the use of those tapes.

I

Appellants Brown and Watson strenuously argue that there was error in not suppressing tape recordings of certain intercepted telephone communications, in not suppressing transcripts of certain intercepted phone communications, and in permitting transcripts of the tape recordings of the telephone conversations to be used by the jurors.[2a]

The admission of tape recordings in evidence is subject to the rules of evidence generally. This means that a proper foundation must be laid for their admission, and that they must be relevant and not privileged. In addition, the Federal Rules of Evidence provide that the original tape re-

---

2. On the conspiracy count, appellant Watson was committed to the custody of the Attorney General for five years to be followed by a special parole term of five years; he also received a concurrent four-year sentence on the substantive count. Appellant Maxwell received a ten-year sentence to be followed with a special five-year parole term on the conspiracy count and a concurrent, four-year sentence on the substantive count. The court found that appellant Brown would not benefit from the provisions of the Federal Youth Corrections Act, 18 U.S.C. §§ 5005–5026, as applied to young adult offenders, see 18 U.S.C. § 4216, and sentenced her to four years to be followed by a five-year special parole term on the conspiracy count. She received a concurrent, three-year sentence on the substantive count.

2a. These contentions are urged in propositions II, III, IV and V of the Brief for the Appellants, respectively claims of error in denying appellant Brown's motion to suppress tape recordings of certain intercepted wire communications for lack of intelligibility, in denying without a hearing Watson's motion to suppress tape recordings of certain intercepted wire communications for lack of intelligibility, in determining that the government introduced evidence sufficient to authenticate tape recordings of certain wire communications involving appellant Brown, and in denying appellant Brown's motion to suppress transcripts of certain tape recordings of certain intercepted wire communications.

cordings be used, if possible,[3] Rule 1002, and that when telephone conversations are involved, evidence be offered as to the correct telephone number, Rule 901(b)(6).[4] Appellants here make several specific challenges to the foundation laid for playing of the tapes which we will consider.

First, appellant Brown argues that there was improper and inadequate identification of the speakers on certain tapes for which agent Bell provided the voice identification. This challenge is based on the claim that agent Bell did not have sufficient opportunity to become acquainted with appellant Brown's voice in order to authenticate tapes introduced at trial. Furthermore, it is claimed that agent Bell's familiarity with Brown's voice was developed after the conversations in question transpired.

Rule 901(b)(5), F.R.E., provides one example of acceptable voice identification as follows:

(5) Voice identification. Identification of voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice *at any time* under circumstances connecting it with the alleged speaker. (emphasis added).

As the Rule plainly says, familiarity with another's voice may be acquired either before or after the particular speaking which is the subject of the identification. *United States v. Kirk*, 534 F.2d 1262, 1277 (8th Cir.), *cert. denied*, 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091. Thus, the fact that Bell did not speak with appellant Brown until after the date of the telephone intercept did not prevent him from authenticating Brown's voice on a tape introduced at trial. See, *e. g., United States v. Cox*, 449 F.2d 679 (10th Cir.), *cert. denied*, 406

U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136. Furthermore, we find that the record reflects that Bell had ample time in which to become acquainted with Brown's voice. He had face-to-face conversations with her on three occasions, and one of these conversations extended over half an hour. (II R. 216–17; IV R. 440). Any doubts about Bell's powers of recall were properly questions for the jury to determine. See *United States v. Vento*, 533 F.2d 838, 865 (3d Cir.); *United States v. Rizzo*, 492 F.2d 443, 448 (2d Cir.), *cert. denied*, 417 U.S. 944, 94 S.Ct. 3069, 41 L.Ed.2d 665. We reject appellant Brown's argument based on *United States v. McKeever*, 169 F.Supp. 426 (S.D.N.Y.), *rev'd on other grounds*, 271 F.2d 669 (2d Cir.), that the court improperly gave the authentication question to the jury. The trial judge properly took evidence on the threshold question whether Bell had *any* basis for identifying the voice and then left all questions of weight and credibility for the jury.

Second, all appellants challenge the use of the tapes on the ground of unintelligibility. Where a tape recording is objected to as unintelligible or inaudible, its admissibility is within the sound discretion of the trial judge. *United States v. Brinklow*, 560 F.2d 1008, 1011 (10th Cir.); *United States v. Jones*, 540 F.2d 465, 470 (10th Cir.), *cert. denied*, 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551; *United States v. Hodges*, 480 F.2d 229, 233–34 (10th Cir.). Unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy, it may be admitted. *United States v. Jones, supra*, 540 F.2d at 470. The trial judge held a pre-trial hearing[5] at which he considered the issue of intelligibility and exercised his discretion on

---

**3.** The government used original tapes in this case.

**4.** The record contains such evidence at III R. 267–68.

**5.** Appellant Watson contends that his motion to suppress should have been heard at this

hearing along with those of his co-defendants and that it was an abuse of discretion and a violation of due process for the trial court to deny his motion to suppress on the ground that it was untimely filed. We disagree and find no abuse of discretion in the ruling.

this issue. From our independent hearing of the tapes we conclude that there was no abuse of the trial court's discretion and no substantial unintelligibility productive of untrustworthiness.

■ Third, appellants argue that it was prejudicial error to provide the jury with transcripts of the tapes during the playing of the tapes. See generally *United States v. Gerry*, 515 F.2d 130, 143–44 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (use of transcripts upheld because trial judge had difficulty understanding them). Proof was offered of accuracy of the transcripts at a pre-trial hearing,[6] and the court permitted their use during the playing of the tapes to permit clear identification of the voices.[7] The trial judge, however, did not admit the transcripts in evidence. Instead he gave a limiting instruction, which he repeated several times during the trial, instructing the jury to use the transcripts only to assist them in listening to the tapes and not to consider the transcripts as evidence. In the sound discretion of the trial judge, which was properly exercised here, such limited use of transcripts is permissible. See *United States v. John*, 508 F.2d 1134, 1141 (8th Cir.), *cert. denied*, 421 U.S. 962, 95 S.Ct.

1948, 44 L.Ed.2d 448; *United States v. McMillan*, 508 F.2d 101, 105 (8th Cir.), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782.

■ We have considered all the contentions regarding the playing of the tapes and the use of the transcripts and are satisfied there was no reversible error. Our hearing of the tapes persuades us that they are substantially accurate and intelligible and that the transcripts are substantially accurate as well. Therefore, with respect to the rights of these three appellants there was no prejudicial error and no abuse of discretion by the trial court in the procedure followed regarding the tapes and the transcripts.[8]

## II

With respect to their convictions under 21 U.S.C. § 846, all three appellants argue that the evidence was insufficient to support their convictions. More specifically, appellants contend that the evidence fell far short of proof beyond a reasonable doubt that each of them had the deliberate, knowing and specific intent to join the conspiracy charged; and that, while viewed in the light most favorable to the government the

---

**6.** A judicial determination of the accuracy of transcripts is not a *sine qua non* of their use, see *United States v. Onori*, 535 F.2d 938, 948 (5th Cir.), but is a recommended practice in the absence of a stipulation by counsel on the point, *cf. United States v. Rochan*, 563 F.2d 1246, 1250–52 (5th Cir.) (accuracy a question of authentication).

**7.** See *United States v. McMillan*, 508 F.2d 101, 105 (8th Cir.), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782. Use of transcripts here is not for purposes of establishing that a particular voice belongs to a particular person, but so that the jury may understand which voice the prosecution wants the jury to believe belongs to a particular person. See *e. g.*, II R. 225–26.· In this case the prosecution introduced oral testimony identifying the voices on all tapes.

**8.** We have noted heretofore that Rule 104(a) of the Federal Rules of Evidence places a responsibility on the trial judge for determining preliminary questions as to the admissibility of

statements of a coconspirator. Such statements are not hearsay and are admissible if there is substantial, independent, nonhearsay evidence demonstrating the existence of a conspiracy involving the speaker and the defendant. See *United States v. Andrews*, 585 F.2d 961, 965–66 (10th Cir.); *United States v. Bell*, 573 F.2d 1040, 1043–44 (8th Cir.).

As the *Bell* case points out, such a determination on the admissibility of an alleged coconspirator's statement is now a preliminary question for the judge, not the jury, to decide under Rule 104. *United States v. Bell, supra*, 573 F.2d at 1043. However, as our *Andrews* opinion says, evidence of the acts and statements of coconspirators may be admitted prior to proof demonstrating participation in the conspiratorial scheme by the objecting defendant, provided the foundation is subsequently laid. 585 F.2d at 966; see *United States v. Bell, supra*, 573 F.2d at 1044. No question on this procedure is raised by these appellants.

evidence showed several telephone conversations with Thompson, that proof alone was insufficient to connect appellants with the conspiracy charged. (Brief for the Appellants, Proposition VI, pp. 31, 37–38).

The basic rule for sufficiency of the evidence to sustain a conviction challenged on appeal is stated by Judge Hill in *United States v. Twilligear*, 460 F.2d 79, 81–82 (10th Cir.):

> This court is bound to view the evidence presented in the trial court in the light most favorable to the government to ascertain if there is sufficient substantial proof, direct and circumstantial, together with reasonable inferences to be drawn therefrom, from which a jury might find a defendant guilty beyond a reasonable doubt.

Of course, guilt is individual and personal, even as regards conspiracies, and is not a matter of mass application. *United States v. Butler*, 494 F.2d 1246, 1256 (10th Cir.). And we agree that proof of the existence of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy such as is charged here. See *United States v. Torres*, 503 F.2d 1120, 1123 (2d Cir.); *United States v. Sperling*, 506 F.2d 1323, 1342 (2d Cir.), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439. Moreover for a single act to be sufficient to draw an actor within the ambit of a conspiracy to violate the narcotics laws, there must be independent evidence tending to prove that the defendant had some knowledge of the broader conspiracy, or the single act must be one from which such knowledge may be inferred. *United States v. Sperling, supra*, 506 F.2d at 1342. For the inference of intent to join a conspiracy to be made from proof of a single act, it must be such as to show the actor's knowledge of the existence and scope of the conspiracy, and his belief that the benefit to be derived from his actions depends on the success of the acts of others. *United States v. Perry*, 550 F.2d 524, 529 (9th Cir.).

A primary government witness was Karen Brooks, an indicted coconspirator. She had waived a jury and was awaiting trial and cooperated with the government in giving her testimony. On cross-examination she stated that it was her understanding that the charges might be dismissed against her or that she might receive probation if she testified. She said this was what her attorney hoped would happen. If she had not had that impression, she admitted she probably would not have testified against the defendants. (III R. 310–315).

Brooks testified that she had known John Hubert Thompson ("J.T."), the Tulsa wholesaler in this drug operation, for nine months. She distributed heroin and cocaine for him and had a telephone installed at his residence in her name. When business was good, Brooks would normally sell "pretty close" to $2,000 worth of heroin and cocaine in a day in quantities priced at $50. (Id. at 289). She worked as a street dealer, turning over the bulk of her proceeds to Thompson, but when he was away she would handle larger transactions for him. She testified that she knew "Pete" Anderson, the California supplier, and that Thompson got his "dope" through Anderson. (Id. at 303). She referred to various street dealers in her testimony, including all three of the appellants.

Brooks testified that she knew Watson and could identify him; that she had been present when Thompson sold heroin to Watson; that she had delivered heroin to Watson for Thompson and that once Watson told her he had several people waiting in the car for "dope." She knew Watson was a user of drugs himself. Brooks further testified that she knew Maxwell; that if she ran out of heroin or cocaine, she would refer her customers to him; that she sold heroin to Maxwell when Thompson was away; and that Maxwell distributed drugs. Brooks also testified that she knew appellant Brown, who was known as "Chi Chi"; that Brown was a seller; that when Brooks ran out of drugs she would refer customers to appellant Brown; that Brooks was present when Brown bought heroin from

Thompson; and that Brown knew the California supplier Anderson. Brooks further said all three defendants knew each other. (III R. 285–299).

In addition to the testimony of Karen Brooks, there was government evidence concerning telephone calls involving all three appellants. For reasons already stated, we have held that there was no error in permitting the playing of tapes of these calls and the use of transcripts relating to them. This evidence included the following:

As to Watson there was evidence of 13 telephone calls occurring between February 10 and February 13, 1977. Eight of these were identified as calls between Watson and Thompson which occurred on February 12. In the first call at 1:23 a. m., Watson ordered "300" [dollars] of "dog," identified as heroin. (I R. 181–82; III R. 273; IV R. 478–81, 512). Three hundred dollars would have purchased a quarter ounce from Thompson. Thompson invited Watson to come to his house for delivery. At about 1:45 a. m., surveillance officers saw an orange Vega arrive at Thompson's house, where a passenger got out and entered the house. In a second call at 11:32 a. m. that day, Watson ordered another $100 worth of heroin, to be delivered at a Bestyet market. Later surveillance officers saw Watson exit the same Vega and meet with Thompson at a Bestyet market in Tulsa, and a hand-to-hand exchange between Watson and Thompson occurred. (IV R. 488–92).

■ At 10:02 p. m. on February 12, Watson arranged a purchase and pick-up of heroin and cocaine, telling Thompson where he was. Surveillance officers observed Thompson leave his house at 10:16 p. m. He met Watson at a laundromat where Watson walked to Thompson's van, and

leaned on the driver's window of the van.[9] Watson returned to the other car and drove off with another occupant, Mark Allen Hart. Officers stopped them a few blocks away and found that Hart possessed heroin.

As to Maxwell, the testimony of Karen Brooks was supplemented with the playing of tapes of telephone conversations with Thompson. Nine calls between Maxwell and Thompson, all of which occurred during a four-day period from February 11 through February 14, 1977, were introduced. For example, at 12:46 p. m., on February 12 Maxwell inquired about an "oz" for "15," an ounce of drugs for $1,500. (III R. 275). At 6:05 p. m. that day Maxwell ordered "a quarter or two of 'that girl'," identified as cocaine. (Id. at 272).[10] Also at 9:38 p. m., on February 12, Maxwell told Thompson that he had "some people visiting" and that "they wanted one of those quarter things of girl." Thompson told Maxwell that he could come over and get a quarter. In a call on the night of February 14, after Thompson asked if he knew someone who wanted "a quarter of dog" (quarter ounce of heroin), Maxwell said "Yeh." (I R. 236). Later that night arrangements were made during a call that Maxwell would meet Thompson at the Blue Goose. Thompson was followed thereafter from his house to the Blue Goose Club, where he met with a black male in a vehicle. (III R. 414–16).

As to Brown, the government also introduced proof of numerous calls, most of them occurring on February 13 and 14, 1977. For example at 11:04 a. m., on February 11, Thompson referred another alleged coconspirator, Alfred Ray Jennings (Fred), to "Chi Chi" for "some girl." Several calls concerned an offer by appellant Brown to trade a black suede and mink coat for drugs. At 4:47 p. m. on February 13,

---

**9.** Such circumstantial evidence may indicate a delivery of drugs. See *United States v. Baldarrama,* 566 F.2d 560, 565 (5th Cir.).

**10.** The repeated use of cryptic expressions by members of a narcotics conspiracy has been

described as a "narcotics code." *United States v. Manfredi,* 488 F.2d 588, 597 (2d Cir.), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240.

during one call Thompson referred a customer who identified herself as "Carol" to Brown. At 5:12 p. m. that same day Brown asked Thompson if she could come by his residence and pick up "number 1 dresses," identified as quantities of cocaine. (III R. 272–75; IV R. 445–46). Again at 1:13 a. m., on February 14 Brown asked permission to come by Thompson's house to pick up "some of those dresses." (III R. 273). At 2:44 a. m., on February 14 Brown asked Thompson if she could come by "again" for "one of those 50's till in the morning." (I R. 230; IV R. 447–51).

There are vigorous arguments made that the testimony of Karen Brooks was unbelievable and unreliable; that the evidence showed only purchases of drugs for the use of appellants themselves, as Watson testified; and, of course, that the recordings were unintelligible and inadmissible. We have already rejected the latter contentions about the tapes and transcripts. With regard to the former contentions, evaluating the credibility of witnesses is a matter for the jury and not an appellate court. *United States v. Twilligear, supra,* 460 F.2d at 82. Essentially the question is whether there was sufficient circumstantial evidence, along with the direct testimony of Karen Brooks, to support the conspiracy convictions. Conspiracy may be proved by circumstantial evidence. See *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; *United States v. Gamble,* 541 F.2d 873, 877 (10th Cir.). Viewing the evidence in the light most favorable to the government, we are satisfied that the existence of the conspiracy, and the knowing and intentional joining in it by the appellants, was sufficiently demonstrated by the evidence to sustain the jury's verdicts. *United States v. Twilligear, supra,* 460 F.2d at 81–82.

### III

As discussed earlier, all appellants strenuously argue that the government's evidence was insufficient to establish that any of them became members of the conspiracy as charged in the indictment. They also say that even if the proof was adequate to link each or any of them to conspiratorial conduct, which they all deny, there was nevertheless a variance between the single conspiracy charged and the several discrete conspiracies which may have been proven by the evidence. They contend that the evidence was woefully inadequate to link the appellants to the overall scheme involving defendants Thompson, Brooks, Anderson and Carlett Jones. (Brief for the Appellants, 58–59). Furthermore, the existence of this variance requires reversal because of the severe prejudice created by the spill-over effect attendant on defendants' trial under a single conspiracy charge. Error is also claimed because of refusal to give appellant Brown's requested instruction on the existence of separate conspiracies.

Appellants rely, *inter alia,* on *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed.2d 1557; *United States v. Bertolotti,* 529 F.2d 149 (2d Cir.); and *United States v. Sperling,* 506 F.2d 1323 (2d Cir.). Special emphasis is placed on the *Bertolotti* opinion which reversed convictions where the court found that the proof showed at least four separate conspiracies instead of the one overall conspiracy charged, where the types of conspiracies concerned various "rip-offs" and crimes which "scarcely resembled one another," *United States v. Bertolotti, supra,* 529 F.2d at 157, and where inflammatory discussions about kidnappings, guns and narcotics were all brought before the jury. We must agree that where such prejudice and separate, identifiable conspiracies are involved a reversal is required, see *United States v. Butler,* 494 F.2d 1246, 1255–57 (10th Cir.); but we feel that is not the case here.

We have discussed the evidence in detail earlier. It suffices to note here that it demonstrated that Anderson supplied drugs from California to Thompson, the Tulsa wholesaler, who distributed them to various

street dealers, including these three appellants. From evidence of the volume and nature of their operations, an inference may be drawn of awareness by appellants of the scope of the narcotics conspiracy.

Where large quantities of narcotics are being distributed, each major buyer may be presumed to know that he is part of a wide-ranging venture, the success of which depends on performance by others whose identity he may not even know. *United States v. Heath,* 580 F.2d 1011, 1022 (10th Cir.). We are satisfied that the evidence here shows a common design to acquire and distribute heroin and cocaine, id. at 1022, and that it was permissible to link the appellants with Thompson and Anderson. Whether the evidence was sufficient to establish the single conspiracy charge [11] was a question for the jury. Id. at 1022; *United States v. Ricco,* 549 F.2d 264, 268 (2d Cir.), *cert. denied,* 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389. The trial court thoroughly and properly instructed the jury on the government's burden of proving the conspiracy charged beyond a reasonable doubt. We are satisfied that the record as a whole supports the jury's verdicts of guilt of the conspiracy charged.

As noted, appellant Brown makes the related argument that the trial court committed prejudicial error in not giving her requested instruction on multiple conspiracies. We do not agree. We feel that the instructions as a whole adequately covered the question since the trial court clearly charged that the government had the burden of proving beyond a reasonable doubt the conspiracy as alleged, and that the evidence should be considered separately as to each individual defendant. (V R.

819–23, 832). In these circumstances we feel that it was not error to refuse the requested instruction concerning multiple conspiracies. See *United States v. Russo,* 527 F.2d 1051, 1059 (10th Cir.), *cert. denied,* 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 831; *United States v. Lam Lek Chong,* 544 F.2d 58, 67–68 (2d Cir.), *cert. denied sub nom. Liganoza v. United States,* 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550; *United States v. Hobson,* 519 F.2d 765, 775 (9th Cir.), *cert. denied,* 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261; *United States v. Salerno,* 485 F.2d 260, 263 (3d Cir.), *cert. denied,* 415 U.S. 994, 94 S.Ct. 1596, 39 L.Ed.2d 891. Thus we are convinced there was no error in refusing the requested instruction.

### IV

The appellants argue that the indictment was insufficient in its allegations of conspiracy. First we will consider the contention that the trial court erred in denying appellant Brown's motion to dismiss the indictment for failure to state facts essential to constitute a conspiracy under 21 U.S.C. § 846. More specifically, appellant Brown says that she is not identified within the portion of the indictment describing the objects of the conspiracy, that clearly the main figures of the conspiracy were Thompson, Anderson and Brooks, and that the only allegations involving her appear in the listing of overt acts (paragraphs 11, 12 and 49), which contains no statement that she purchased, sold or distributed narcotics or that she assisted Thompson, Anderson, Brooks or Carlett Jones in the performance of functions necessary to the continuation or success of the scheme. (Brief for the Appellants, 17–21).

---

11. The conspiracy charged by count one of the indictment was an unlawful conspiracy to knowingly and intentionally possess with intent to distribute and to distribute heroin and cocaine, and to knowingly and intentionally use telephones in committing, causing and facilitating the commission of possession with intent to distribute, and the distribution of controlled substances. The indictment outlined the method used by the conspiracy including procurement by Thompson of heroin and cocaine from Anderson, and dilution and repackaging in smaller quantities by Thompson for resale to others. The allegations of overt acts included in the indictment described the involvement of appellants as sellers whose source was Thompson.

Count 1 of the indictment alleges a conspiracy from on or about January 1 until on or about February 22, 1977, within the Northern District of Oklahoma, and elsewhere, charging that the 15 named defendants, all specified and including "MAE LILLIAN BROWN, a/k/a 'Chi Chi'," did knowingly, willfully and unlawfully combine and conspire to knowingly and intentionally possess with intent to distribute and to distribute heroin and cocaine, controlled substances, and to knowingly and intentionally use a telephone in committing, causing commission of and facilitating the commission of possession with intent to distribute and distribution of narcotic drugs.

Further the indictment alleges that the objects of the conspiracy were to be accomplished, *inter alia*, by Thompson making arrangements to procure heroin and cocaine from Anderson, and then diluting the drugs, repackaging them in smaller quantities, and selling them "to various other co-conspirators," who would dilute and/or repackage the drugs still further and sell them to other customers. The allegations of the overt acts included references to defendant Brown as follows:

11. On or about February 11, 1977, at about 11:01 a. m., defendant MAE LILLIAN BROWN, also known as "CHI CHI," had a telephone conversation with unindicted co-conspirator Charles Etta Saulters, in Tulsa, Oklahoma, which, in substance, concerned the trading of a coat for narcotics.

12. On or about February 11, 1977, at about 11:04 a. m., defendant ALFRED RAY JENNINGS had a telephone conversation with defendant JOHN HUBERT THOMPSON, in Tulsa, Oklahoma, which, in substance, concerned the arrangements for delivery by THOMPSON of a quantity of cocaine to ALFRED

RAY JENNINGS and THOMPSON's prior delivery of cocaine to defendant MAE LILLIAN BROWN also known as "CHI CHI."

49. On or about February 14, 1977, at about 01:13 a. m., and at about 2:44 a. m., defendant MAE LILLIAN BROWN, also known as "CHI CHI," had a telephone conversation with defendant JOHN HUBERT THOMPSON, in Tulsa, Oklahoma, which, in substance, concerned the arrangements for defendant MAE LILLIAN BROWN to come by defendant THOMPSON's house and take delivery of a quantity of cocaine.

We are satisfied that the conspiracy allegations of the indictment were sufficient as to appellant Brown. A charge of conspiracy is sufficient if it follows the statutory language and contains an adequate statement of an overt act to effectuate the object of the conspiracy, and the requisite overt act need not be criminal in itself. *United States v. Sterkel,* 430 F.2d 1262, 1263 (10th Cir.). The allegations must be adequate to inform the defendant of the nature of the charge and to serve, together with the record and judgment of conviction, as sufficient protection against possible double jeopardy. Id. at 1263–64. The indictment in the instant case satisfied these requirements, charging the named defendants with conspiring for the particular unlawful purposes alleged. Moreover in the later allegations of overt acts, appellant Brown was clearly alleged to have discussed the trading of narcotics, to have received delivery of cocaine, and to have discussed by telephone arrangements for taking delivery of cocaine. Such allegations in the overt acts may be considered in judging sufficiency of the conspiracy indictment. See *United States v. Strauss,* 283 F.2d 155, 159 (5th Cir.).[12]

---

**12.** We have considered the *Strauss* case, which is relied on by appellant Brown, but it is clearly distinguishable. The allegations of combination, conspiracy, etc., there were all directed toward a scheme to defraud creditors, a violation of 18 U.S.C. § 152 prohibiting the concealment of assets of a corporation. The additional citation of the mail fraud statute in the indictment was the only actual reference to matters relating to mail fraud, and thus that part of the

With respect to the conspiracy charge, we feel that the indictment met the fundamental requirements discussed above, and the constitutional requirement to inform the defendant of the nature and cause of the accusation against her. It also complied with the pleading requirement of a plain, concise and definite written statement of the essential facts constituting the conspiracy offense charged. See *United States v. DePugh,* 452 F.2d 915, 920 (10th Cir.); Rule 7(c), F.R.Crim.P. Thus, appellant Brown's challenge to the sufficiency of the conspiracy charge must fail.

## V

The appellants all strenuously argue that the proof was insufficient to sustain their convictions of the substantive offense of violation of 21 U.S.C. § 843(b),[13] using the telephone to facilitate the commission of possessing with intent to distribute and distributing controlled substances. They say that the substantive counts (counts IX, X and XV relating respectively to defendants Maxwell, Watson and Brown) charged use of the telephone in committing, causing the commission of, and facilitating knowing and intentional possession with intent to distribute *and distribution of controlled substances,* and that there was no proof of any delivery of the substances after the calls. Since the actual offense charged, which included distribution, was not proven, appellants contend there was insufficient proof of violation of § 843(b), as was held by *United States v. Leslie,* 411 F.Supp. 215 (D.C.Del.); cf. *United States v. Rodriguez,* 546 F.2d 302, 307–09 (9th Cir.).

■ There are variations in the facts with respect to each of these three appellants, and the proof was stronger against defendants Watson and Maxwell than it was against defendant Brown.[14] Neverthe-

---

indictment was held insufficient. That case is wholly unlike the instant indictment, outlined above.

**13.** Section 843(b) reads as follows:

Communication facility

(b) It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter. Each separate use of a communication facility shall be a separate offense under this subsection. For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication.

**14.** Count X of the indictment alleges that Watson and J.T. "discussed in substance, delivery arrangements for a sale of heroin and cocaine" in a phone conversation occurring at about 9:39 p. m., on February 12, 1977. (I R. 27). The tape of this call from Watson to J.T. was played at trial. The voices on the tape were identified, (IV R. 510–12), and testimony was taken concerning a subsequent meeting between Watson and J.T. (IV R. 516–31). The record shows that shortly thereafter Watson was arrested in the company of Mark Allen Hart, who was found in possession of heroin. (IV R. 546–54). Appellant Watson contends that this testimony is deficient as to him because he was not found in possession of any drugs. Furthermore, he claims the telephone call related only to cocaine, and Hart was found in possession of heroin. Yet, the jury could have found that the call related to both drugs and that after the pickup from Watson, see generally *United States v. Baldarrama,* 566 F.2d 560, 565 (5th Cir.), he had personally used the cocaine. The evidence is therefore sufficient to show not only that Watson used the telephone to facilitate J.T.'s possession with intent to distribute but also to facilitate his own distribution.

Count IX of the indictment alleges that Maxwell and J.T. "discussed, in substance, the sale of cocaine to Maxwell" in a phone conversation occurring about 9:38 p. m., on February 12, 1977. (I R. 26). The tape of the call was played at trial, and the voices on the tape were identified. (III R. 398–400). Maxwell clearly states that some people are visiting and "They wanted one of those quarter things of girl." (Quarter ounce of cocaine). J.T. tells Maxwell that he may come get the quarter ounce. (I.R. 204). In light of Karen Brook's testimony that J.T. periodically possessed large amounts of

less, we are persuaded that the substantive convictions of all these appellants should be upheld on the basis of the position presented by the government to the trial court, and as accepted and spelled out in the discussion of the issue by the trial judge when he overruled the defendants' motions for acquittal. (V R. 690–701).

The theory of the trial judge was essentially that, viewing the evidence favorably to the government, Thompson was a distributor, that he was committing the felony of possession with intent to distribute the controlled substances, that under the *modus operandi* of Thompson the telephone was used to facilitate distribution, and that when defendants used the telephone and contacted Thompson, they thus facilitated his unlawful possession with intent to distribute.

 We agree, for the telephone, as this record shows, was indeed used to facilitate distribution and to reap the profits which fed the operation. Viewing the evidence favorably to the government, there was proof that the appellants, as street dealers, were using the telephone to obtain heroin or cocaine for resale. Their calls come within the common meaning of facilitate— "to make easier," Webster's New Collegiate Dictionary, p. 410 (1975)—by making easier the commission of the offense of possessing the substances with intent to distribute. The facilitation of that offense of posses-

sion is enough. Although the indictment did also allege conjunctively that the calls aided the distribution of the substances as well as possession with intent to distribute, it was sufficient for the government to prove that either the possession or distribution offenses were facilitated. See *Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 24 L.Ed.2d 610.

*United States v. Leslie*, 411 F.Supp. 215 (D.C.Del.), dismissed a case brought under § 843(b) where there was a charge of use of the telephone to facilitate distribution of methamphetamine. It was stipulated that the informant in the United States receiving the defendant's calls from Canada had no such substance and that no methamphetamine came into the United States as a result of the calls. The court held that in view of the legislative history and wording of the statute, proof of a mere attempt or conspiracy to commit such a violation was not enough without proof of actual distribution.

We are inclined to agree with the Third Circuit's rejection of the statutory interpretation in *Leslie*. See *United States v. Pierorazio*, 578 F.2d 48, 51 (3d Cir.), *cert. pending*. In addition, our case is different from *Leslie* because here there *was* evidence of actual possession with intent to distribute and of circumstances from which it could be inferred that the defendants' calls facilitated that unlawful possession.

---

heroin and cocaine and that J.T. had her install a phone at his residence in her name (III R. 267, 287, 305), evidence such as that presented here against appellant Maxwell that use was made of that phone line for a drug related conversation amply supports Maxwell's conviction under § 843(b) for facilitating J.T.'s possession with intent to distribute.

Count XV of the indictment alleges that Brown and J.T. "discussed, in substance, the sale of cocaine to Brown," in a phone conversation occurring about 1:13 a. m., on February 14, 1977. (I R. 28). The tape of the call was played at trial, and the voices on the tape were identified. (IV R. 443–46). In the conversation Brown identifies herself and inquires whether she may "come by and pick up some of those dresses" (cocaine). (I R. 229). This call fol-

lowed a call of eight hours earlier concerning a pick-up for "number one dresses," (I R. 228) and it preceded a call a mere hour and a half later in which Brown asked J.T. whether she could come by "again" for "one of those 50's till in the morning." (I R. 230). She also said that in the morning, "tomorrow," she would come get "that quarter." In view of the evidence that Brown made several calls during this period of time; that Thompson held significant quantities of drugs; that he had had a telephone installed; and that Brown used that line in this specific instance for a drug related conversation, we sustain Brown's conviction under § 843(b) for facilitating Thompson's possession with intent to distribute.

For these reasons we uphold the convictions of the appellants for substantive offenses under § 843(b).[15]

## VI

Lastly, appellants claim prejudicial error in the admission over objections by them, of evidence relating to a seizure of narcotics and other items at the home of coconspirator Anderson in Fresno, California.

Appellants point to the conclusion of the government's case by the introduction of evidence concerning a search of Anderson's home in Fresno and the seizure of a large quantity of heroin and cocaine, forty-nine pounds of lactose, one hundred bricks of mannite and various narcotics paraphernalia including scales, sifters, strainers and spoons. In addition, $16,000 in cash was discovered in a bedroom drawer and another $10,013 between the mattresses.

Objections were made of irrelevancy under Rule 402 and of unfair prejudice outweighing probative value, under Rule 403, F.R.E. Appellants say there was no proof connecting any of them to a conspiracy to import narcotics from California or with Anderson, and that the powerful effect of the evidence on the jury was prejudicial. The argument is renewed that in any event no more than multiple conspiracies were shown, with proof as to any conspiracy to import narcotics from California being a prejudicial variance from the conspiracy charged.

We dealt with the single-multiple conspiracy issue earlier and concluded that the proof of a conspiracy embracing importation from California was sufficient to go to the jury. We agree with the trial court's ruling that the evidence concerning the items seized at Anderson's California home was relevant to show the existence and scope of the conspiracy. It was conceded by the government that the raid occurred

on February 21, 1977—over a week after the overt acts of February 12 and 14, (I R. 601–03), which are alleged against these appellants. However, there was evidence that Thompson sent Anderson a suitcase containing $14,000 on February 12. The challenged evidence was therefore relevant to establish Anderson's possession of a large amount of cash, drugs and narcotics paraphernalia within a reasonable time after the appellants' activities, as well as to corroborate the government's testimony on the functioning of the conspiracy.

■ We cannot agree that the trial judge erred in his ruling that the potential for prejudice did not call for exclusion of the evidence. Rule 403 provides that, although relevant, evidence may be excluded if its probative value is substantially outweighed, *inter alia*, by the danger of unfair prejudice, confusion of the issues, or misleading the jury. This determination is within the sound discretion of the trial judge, *United States v. Krohn, supra,* 573 F.2d at 1389, and we find no abuse of that discretion in this case.

We have considered the remaining arguments of appellants and find them to be without merit and to call for no further discussion. We conclude that no reversible error is demonstrated and accordingly the judgments are

AFFIRMED.

McKAY, Circuit Judge, dissenting:

One does not have to have any sympathy for drug dealers to express a deep concern about the erosion of fundamental doctrines of liberty when that erosion occurs in cases dealing with drug dealers. This case represents one more example of the continuing erosion of the concept that "[g]uilt with us remains individual and personal, even as respects conspiracies. It is not a matter of mass application." *Kotteakos v. United States,* 328 U.S. 750, 772, 66 S.Ct. 1239,

---

**15.** A similar argument is made that since distribution was an essential element for conviction of appellant Brown under § 843(b), the indictment was defective in making that charge. She says that the indictment did not allege that she actually took delivery of cocaine and did

not imply or suggest that she intended to or did distribute cocaine. For the reasons stated above we must disagree and hold that the substantive charge against defendant Brown in count XV was sufficient as pleaded.

1252, 90 L.Ed. 1557 (1946). While I have expressed elsewhere in greater detail my concern about the growing tentacles of conspiracy doctrines, *United States v. Heath*, 580 F.2d 1011 (10th Cir. 1978) (McKay, J., dissenting), the Court's analysis in this case compels me to reiterate my apprehensions.

In this case all that the evidence shows is that one Thompson was a major drug dealer in Tulsa, Oklahoma, and that these defendants obtained their supplies (apparently for resale) from him. If we take seriously our stated standard that criminal cases must be proved beyond a reasonable doubt, I do not believe that this record supports a finding that these customers of one dealer were connected together in a common conspiracy. What is missing is the "rim of the wheel to enclose the spokes" of a conspiracy. *See Kotteakos v. United States*, 328 U.S. at 755, 66 S.Ct. at 1243. Even more alarming is the absence of any evidence under either a civil or criminal standard of proof which would show that these defendants were knowingly involved by agreement with James Anderson—Thompson's California supplier. The majority in this case makes that leap by further enshrining in the criminal law what is essentially the "affecting commerce" rationale of *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942).[1]

It is obvious why some prosecutors, with our aid and comfort, are enamored of bringing allegations of mass conspiracy. No matter how thin the proof as to individual defendants, once the jury has looked at the sheer numbers involved and has been shocked by the extensive evidence of criminal activity by a remote actor,[2] the chance that they will pay serious attention to the absence of substantial proof as to one individual is not particularly great. A doctrine which permits this impairs liberty.

To avoid the obvious prejudice attending a mass trial, we ought to return to the principles enunciated in *Kotteakos* and *United States v. Butler*, 494 F.2d 1246 (10th Cir. 1974). Although it may represent some inconvenience to the government, my position here would not prevent the government from legitimately prosecuting those who were in fact guilty.[3] In any event, mere inconvenience to the government has never been an adequate justification for the erosion of principles governing fair trial. *See Kotteakos v. United States*, 328 U.S. at 773, 66 S.Ct. 1239.

I would reverse.

---

1. Although not totally without hyperbole, I made this observation earlier in *United States v. Heath*, 580 F.2d at 1032 (McKay, J., dissenting). Its repetition seems justified here in view of the majority's insistence that the large amount of narcotics distributed gives rise to a presumption of knowing participation in a "wide-ranging venture." It is difficult to imagine how such an analysis can be effectively limited in its scope. The expansiveness of this rationale threatens to render meaningless the very word it seeks to define—"conspiracy."

2. When one examines the evidence against Anderson set forth on page 1344 of the majority opinion, it is clear why the prosecutors wished to have these small fry tried with him even though no evidence at all linked them together in a conspiracy.

3. As in *Kotteakos*, there was in this case substantial evidence of individual conspiracies between each of these defendants and their supplier, Thompson. There was also evidence of conspiracy between Thompson and Anderson.