**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 16 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ULYSSES HARPER, also known as
Larris Jeroy Slayton

Defendant - Appellant.

No. 97-2153

D. New Mexico

(D.C. No. CR-96-220-JC)

**ORDER AND JUDGMENT**[*]

Before **ANDERSON**, **MCKAY**, and **EBEL**, Circuit Judges.

Ulysses Harper appeals his conviction for conspiracy to possess

methamphetamine with intent to distribute and aiding and abetting, violations of

21 U.S.C. § 846 and 18 U.S.C. § 2. Harper argues that there was insufficient

proof of his involvement in the conspiracy charged in the indictment. He also

argues that evidence of prior bad acts was improperly introduced at trial, and that

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3

he was improperly refused a jury instruction on his claim that he withdrew from the conspiracy. We reject each of Harper's claims and affirm his conviction.

## I. BACKGROUND

Harper's conviction stems from drug trafficking activities in California and New Mexico. He was indicted for conspiracy and aiding and abetting along with ten codefendants: Christopher Lee, Alfred Ellick, Bryant Marshall, Melanie Young, Ricardo Vera, Michael Clark, Joe Altamirano, Mary Sanchez, Burch Woody McCoy, and Kenneth Brown. Harper, Ellick, Marshall, McCoy, and Altamirano were tried together; at trial, Clark, Young, and Brown testified for the government pursuant to plea agreements. At the time of trial, Lee and Sanchez were fugitives.

Evidence at trial showed that in late 1994 or early 1995, the Drug Enforcement Agency (DEA) began receiving information about a possible methamphetamine distribution ring in Roswell, New Mexico. Through a series of tips and cooperative law enforcement efforts, Christopher Lee and Harper were apprehended in San Bernardino, California on June 14, 1995, as they prepared to take an Amtrak train to Albuquerque. They identified themselves as Christopher Lee and Larris Slaton (one of Harper's aliases). After initial questioning, officers obtained Lee and Harper's consent to search their persons and luggage.

In their search of Harper and his luggage the officers discovered a gift-wrapped package containing five pounds of methamphetamine. (Harper's fingerprint was later found on the package.) They also found a handgun, a "pay/owe" accounting sheet, $4,800 in cash, and a black address book. Lee and Harper each had a canister of pepper spray. Lee's luggage contained a roll of film showing pictures of Lee and Harper. Harper's address book listed Ellick's phone number next to the initials "A.J."

Further investigation revealed that on this trip Harper rented a hotel room using an identification card issued to him with the address of 83 Holman in Roswell, New Mexico–Ellick's residence. Baxter Jones (under separate indictment) testified under a plea agreement that he and Ellick were to receive some of the confiscated methamphetamine. Michael Clark testified that Ricardo Vera told him about the loss of the drugs. Bryant Marshall testified that he drove Lee and Harper to the train station in Albuquerque for the first leg of the trip.

Lee and Harper were arrested and then released from custody. Harper went to Las Vegas and set up residence there. In September 1995, Harper was arrested on an unrelated charge and remained in custody in Arizona on this unrelated matter until August 5, 1996, at which time he was arraigned on the present charge pursuant to a writ of habeas corpus ad prosequendum.

Evidence at trial showed that during Harper's incarceration in Arizona, investigators uncovered the methamphetamine distribution activities of several people with whom Harper had been involved. In April 1996, Federal Express employees in Memphis, Tennessee intercepted one pound of methamphetamine in a package addressed to Melanie Young, a former girlfriend of Harper's, in Alamogordo, New Mexico. It had been mailed by "C.Y. Rodriquez" from "Mail Plus" in Ontario, California. Vera lived in Ontario. On April 4, 1996, a DEA agent posing as a Federal Express employee delivered the package while other agents surveilled the residence. Young signed for the package and the undercover agent left. Then the other agents surrounded and searched the house pursuant to a warrant. Lee and Marshall were also at the residence and unsuccessfully tried to flee. Evidence recovered from the residence included the package, a pistol, a book containing phone numbers for Marshall and Lee, a slip of paper with the name "C.Y. Rodriquez" and the phone number of Vera, and photographs of Harper and Lee. Officers also found two letters from Harper to Young, sent from jail in Arizona, dated February and March 1996.

After the events at Young's residence, DEA agents interviewed Christopher Lee. Lee cooperated with the agents and on May 1, 1996, he gave his pager to Agent Steven Woodson. Later that day, Woodson received pages from Vera and Altamirano. Woodson then began posing as one of Lee's distributors. He spoke

with Vera by telephone and arranged a methamphetamine purchase. DEA agents wired over $2,000 to Vera and Clark, and Clark delivered six ounces of methamphetamine to undercover DEA agents in Roswell, New Mexico on June 6, 1996.

After receiving Altamirano's page, Agent Woodson called him to arrange an undercover drug purchase. Altamirano asked agents to wire money to him (in Burch Woody McCoy's name) in Ontario, California, as a show of good faith. They wired at least $900, and Altamirano confirmed receipt of the money, promising a delivery in Albuquerque, where Altamirano claimed to have other distributors. On June 14, 1996, Altamirano, Brown, Sanchez, and McCoy met with Woodson and other DEA agents in Albuquerque, and delivered methamphetamine in exchange for $2000. All four were then arrested.

In the meantime, on May 30, 1996, DEA agents and other law enforcement officers executed a search warrant at Ellick's residence in Roswell. During the search, Ellick spoke with Agent Steven Woodson for about an hour. According to Woodson's testimony, Ellick admitted to being involved with Christopher Lee and others in the distribution of methamphetamine. He told Woodson he had traveled four or five times between California and Roswell delivering methamphetamine.

Officers executing the search warrant found physical evidence of drug trafficking. They found a handwritten transaction record detailing exchanges of

"grams" placed in "bags" for dollar amounts, involving "Mr. E," "Mr. P," and "Marshall." (Christopher Lee used "Pimp" as a nickname.) For example, "In California, Mr. E. gave Mr. P. $1,000 in $100 bills for the balance of Monday, January 15, 1996, pickup of 12 grams." Trial Transcript (Tr.) at 355. One entry denotes a $3,400 transfer from "Mr. E" to "Mr. P." Id. Officers obtained telephone records for Ellick's residence documenting phone calls to Ricardo Vera's pager, as well as a $3,240 cellular telephone bill. They also found a handgun.

These officers also uncovered evidence linking Harper to Ellick. They found a receipt in the name of Larris Slaton (one of Harper's aliases), as well as a photograph of Harper matching one found in Young's residence. They found a handwritten letter from Ellick to a state judge on behalf of Harper, stating "Ulysses has lived with me and my family for the last four years. He has been a positive influence on us all." Tr. at 352. They also found a piece of paper with Harper's Arizona jail address.

At trial the government presented other evidence linking Harper to the activities of his codefendants, both before and during his incarceration. There was evidence of a wire transfer of $899 from Lee to Harper in December 1994, as well as transfers from Ellick to Vera, Marshall to Vera, and Vera to Altamirano. Some

of these transfers were sent from or received at the address of 83 Holman in Roswell, New Mexico–the same address found on Harper's ID card.

There was also testimony from Clark, testifying under a plea agreement, that he knew Harper as one of a number of people who had traveled to California and stayed at Vera's home in Ontario, people to whom Vera sold drugs, whom Vera called "big money." Tr. at 409. Clark testified that these people included not only Harper but Lee, Ellick, and Marshall. He testified that Altamirano and Vera worked together selling drugs. He testified that after Vera and Altamirano had a fist fight over a drug deal, Vera said that he would be glad when Harper got out of jail "because [Harper] didn't do business like that." Tr. at 413.

The government presented a letter from Harper to Lee dated January 20, 1996, sent from jail in Arizona. The letter said, "I want you to send that money to Melanie as soon as you can get this," and gave Young's address in Alamogordo. "Thank you, Boy. You don't know how glad I am to hear from you and to know that you are taking carry [sic] of my affairs." Tr. at 579. In his letters to Young, Harper stated that he would no longer be selling drugs, and repeatedly told Young to stay away from drugs.

Baxter Jones (under separate indictment) testified under a plea agreement that Young introduced him to Harper "[b]ecause she knew we both sold drugs, and she thought it would be making a connection." Tr. at 251-52. He described

Harper as the "brains of the group," Tr. at 260, and Harper and Lee as "drug partners," Tr. at 252. He identified Harper as one of his sources of methamphetamine for resale, and stated that he and Harper had discussed the loss of methamphetamine in San Bernardino.

Melanie Young testified pursuant to a plea agreement that Harper had introduced her to Lee, that Harper and Lee dealt drugs, and that Harper told Lee to give her some money. She related that Marshall had visited Harper in jail in Arizona. She stated that she had taken Harper's address book from Marshall's house.

Young also testified that she had gone to California in 1994 to pick up 27 ounces of rock cocaine, and that she was supposed to deliver the cocaine to Harper, but that someone broke into her motel room, choked her, put a gun to her head, and took the cocaine. In closing statements the prosecutor argued this evidence to the jury, stating of Harper, "he didn't mind sending her [Young] to California with a load of drugs where she got beat up and pistol whipped." Tr. at 887.

At the close of trial, Harper's attorney submitted a jury instruction on his claim that he withdrew from the conspiracy, and the government also sought to submit such an instruction. The court determined that there was "not enough evidence of a withdrawal from the conspiracy to go to the jury." Tr. at 802.

-8-

However, upon request the court allowed Harper's attorney to argue withdrawal to the jury.

The jury found Harper guilty of conspiracy and he was later sentenced to 210 months imprisonment.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Harper appeals the district court's denial of his motion for a judgment of acquittal for insufficiency of the evidence. In considering this claim, we review the record de novo, United States v. Chavez-Palacios, 30 F.3d 1290, 1294 (10th Cir. 1994), viewing "the direct and circumstantial evidence, along with reasonable inferences therefrom, . . . in a light most favorable to the government," United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994). We will uphold the denial of a motion for acquittal based on insufficiency of the evidence if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

Harper argues that there was insufficient evidence to show that he conspired to possess the five pounds of methamphetamine he was carrying when he was arrested. In the alternative, he argues that even if he conspired with Mr. Lee, he did not conspire with any of the other defendants because his activities

were not interdependent with theirs. The elements of conspiracy are "(1) agreement with another person to violate the law; (2) knowledge of the essential objectives of the conspiracy; (3) knowing and voluntary involvement; and (4) interdependence among the alleged coconspirators." United States v. Edwards, 69 F.3d 419, 430 (10th Cir. 1995). The government need not provide direct evidence of agreement, because "a jury may infer an agreement constituting a conspiracy from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose." United States v. Bell, 154 F.3d 1205, 1208 (10th Cir. 1998).

There is abundant evidence that, at the very least, Harper conspired with Lee to possess and distribute the five pounds in his luggage. They were arrested together in a train station, traveling together on a route identified by the DEA as a possible drug distribution route. Each was carrying a canister of pepper spray. Baxter Jones testified that the two were "drug partners," that they had supplied him with between four and ten pounds of methamphetamine, and that Lee lived with Harper when Harper was selling Jones drugs. Melanie Young testified that Harper had introduced her to Lee, that Harper and Lee had lived together for a time, and that both Harper and Lee dealt drugs. On these facts, the jury reasonably concluded that Harper and Lee knowingly agreed to possess the five pounds in Harper's luggage and that they intended to distribute it.

-10-

Harper argues that even if he did conspire with Lee as to the five pounds, there is no evidence that he conspired with other persons named in the indictment, and his activities were not interdependent with theirs. We disagree. "Interdependence exists where each coconspirator['])s activities constituted essential and integral steps toward the realization of a common, illicit goal." Edwards, 69 F.3d at 432. Harper's activities were an integral part of the conspiracy charged. Baxter Jones testified that he and Alfred Ellick expected to get a portion of the five pounds confiscated from Harper. He testified that Young introduced him to Harper because both sold drugs. Clark named Harper, Lee, Ellick, and Marshall as the persons whom Vera referred to as "big money," and testified that Vera mentioned looking forward to resuming dealings with Harper when Harper got out of jail. Jones testified that Bryant Marshall was Lee and Harper's "flunky," and that when Jones dealt with Harper, Marshall "was just always there, always around." Tr. at 256-57. He further testified that Young gave him rides to pick up drugs from Harper. He characterized Harper as the "brains of the group." Tr. at 260. This evidence was sufficient to show that Harper dealt directly with Ellick, Marshall, Young, Vera, and Clark, as well as with Lee. The jury could reasonably conclude that Vera (with the aid of Clark) supplied drugs to Harper, who, with the aid of Young and Marshall, sold them to Ellick and Jones, among others.

Furthermore, even though there was little or no evidence at trial of direct dealings between Harper and McCoy, Altamirano, Sanchez, and Brown, Harper was shown to be part of one branch of what he must have known to be an extensive operation with multiple branches. "Where large quantities of narcotics are being distributed, each major buyer may be presumed to know that he is part of a wide-ranging venture, the success of which depends on performance by others whose identity he may not even know." United States v. Watson, 594 F.2d 1330, 1340 (10th Cir. 1979). On the facts here, a jury could reasonably conclude that Harper's handling of large quantities of methamphetamine was essential to the large-scale operation run by Vera and Altamirano, which included all the persons named in Count I of the indictment.

**B. Refusal to Give Jury Instruction on Withdrawal**

Harper contends that the district court erred in refusing to give a jury instruction on his claim of withdrawal from the conspiracy, and that we should review that refusal de novo. Harper has not complied with Tenth Circuit Rule 28.2(c), which requires that when an appeal "is based upon . . . the giving or refusal to give a particular jury instruction," an appellant must include in his opening brief "a statement as to where a proper objection and the court's ruling thereon may be found in the record." Our review of the record leads us to

conclude that Harper's counsel did not make a proper objection. When the court

refused to give an instruction on withdrawal, counsel for Harper asked only if he

could argue withdrawal to the jury. Tr. at 802-03. Federal Rule of Criminal

Procedure 30 requires that objections to the failure to give a jury instruction must

be made by "stating distinctly the matter to which that party objects and the

grounds of the objection." We see no such distinct statement in counsel's

remarks, and we therefore review only for plain error. See, e.g., United States v.

Smith, 13 F.3d 1421, 1424 (10th Cir. 1994).

In order to show plain error, Harper must identify an obvious error that not

only affected his substantial rights but "seriously affected the integrity of his

judicial proceedings." Bell, 154 F.3d at 1209. We see no such error here because

the evidence of Harper's withdrawal was both scant and contradicted. Although

Harper made a statement in a letter to Young, an indicted coconspirator, to the

effect that he would not be selling drugs anymore,[1] there was also testimony that

while Harper was in jail he continued contact with coconspirators and that he

directed their actions from inside prison. An instruction from the court on

---

[1]
> You know that I have changed my life, and I think and know for the better.
> I will not be selling drugs and any of the other illegal activity at all, so I
> guess I will be getting a job, two or three, so don't feel bad about working.
> . . . I have learned don't take the easy way out, but when you work hard for
> something you appreciate it more, and you have it longer.

Tr. at 774.

withdrawal might have aided the jury in evaluating this conflicting evidence. However, the failure to give such an instruction was not plain error.

Even assuming some error, the court's refusal to given an instruction on withdrawal was partly offset by the fact that the court allowed Harper's counsel to argue withdrawal to the jury. More conclusively, even if an instruction had been given and had led the jury to accept Harper's withdrawal argument, the jury could still have found him guilty of the charged conspiracy. A person who withdraws from a conspiracy nevertheless is responsible for his own acts and those of his coconspirators prior to withdrawal. See United States v. Gonzalez, 797 F.2d 915, 916-17 (10th Cir. 1986). In that case, Harper's sentence would likely have been the same, because he was actually sentenced based only on the five pounds confiscated before his alleged withdrawal. In these circumstances, Harper's substantial rights were not affected and the integrity of the proceedings was not compromised.

## C. Prior Bad Acts Evidence

Harper appeals the denial of his motion for a new trial. He contends that the admission of Young's testimony regarding her trip to California to bring him cocaine was improper evidence of prior bad acts and should have been excluded. Harper did not object to the evidence at trial and therefore we review its

admission only for plain error.  See United States v. Wilson, 107 F.3d 774, 782 (10th Cir. 1997).  Harper must show that the admission of the evidence was an obvious error that "placed the underlying fairness of the entire trial in doubt" or that "affected one of [his] substantial rights."  United States v. Hill, 60 F.3d 672, 675 (10th Cir. 1995).

We do not see an error of such magnitude.  Even without Young's testimony, there was already evidence that Harper had previously dealt drugs; in fact, in his closing argument Harper's attorney conceded as much.  He stated, "I'm not going to tell you he [Harper] wasn't–hasn't been a drug dealer in his past.  I think the evidence shows he has."  Tr. at 870.  In the context of the entire trial and in light of these statements by counsel, Young's testimony regarding Harper's procurement of cocaine did not affect Harper's substantial rights and did not render the trial fundamentally unfair.

Harper further argues that the prosecutor's reference during closing arguments to Young's statements constituted misconduct.  Because Harper did not object at trial to the prosecutor's statements, we review only for plain error.  United States v. Lonedog, 929 F.2d 568, 570 (10th Cir. 1991).  Again, the evidence against Harper was extensive and the fact of his drug dealing well-established.  In addition, Harper did not object in the first place to the testimony to which the prosecutor referred.  There is no plain error on this record.

For the foregoing reasons, we AFFIRM.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge